**Ralph W. McGEHEE, Appellant**

v.

**William CASEY, Director, CIA.**

**No. 81–2233.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 18, 1983.

Decided Oct. 4, 1983.

Mark H. Lynch, Washington, D.C., with whom Susan W. Shaffer and Thomas R. Kline, Washington, D.C., were on brief, for appellants.

Al J. Daniel, Jr., Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Robert E. Kopp and Anthony J. Steinmeyer, Attys., Dept. of Justice, Washington, D.C., were on brief, for appellee. Susan M. Chalker, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellee.

Before WALD, Circuit Judge, MacKINNON, Senior Circuit Judge, and CELEBREZZE,* Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

Opinion for the Court filed by Circuit Judge WALD.

Separate Statement filed by Circuit Judge WALD.

Special Concurrence filed by Senior Circuit Judge MacKINNON.

WALD, Circuit Judge:

Appellant Ralph W. McGehee is a former Central Intelligence Agency (CIA) officer. When he joined the CIA, McGehee signed an agreement that on its face bars him from revealing classified information without prior CIA approval. After the CIA censored portions of a manuscript he wrote, McGehee sought a declaratory judgment that the CIA classification and censorship scheme violates the first amendment and that, even if the scheme were constitutional, his article contains no properly classified material. The district court rejected McGehee's first amendment challenge, and found, after giving deference to the CIA's judgment, that the CIA had properly classified the censored materials.

We affirm. The CIA classification and censorship scheme protects critical national interests. Furthermore, the classification criteria applied in this case—for "secret" information—specify the nature of information subject to censorship with sufficient particularity to satisfy the applicable constitutional tests for first amendment restraints on former CIA employees. The district court also properly gave deference to the CIA's detailed and reasoned explanation of its classification decisions. We agree that the CIA reasonably classified as "secret" the censored portions of McGehee's article.

## I. BACKGROUND

In 1952, when he joined the CIA, McGehee signed a secrecy agreement, promising not to divulge "classified information" obtained by virtue of his employment "unless specifically authorized in writing" by the CIA to do so.[1] Pursuant to this agreement, on March 20, 1981, he submitted an article to the CIA for prepublication review. The article asserted that the CIA had mounted a campaign of deceit to convince the world that the "revolt of the poor natives against a ruthless U.S.-backed oligarchy" in El Salvador was really "a Soviet/Cuban/Bulgarian/Vietnamese/PLO/Ethiopian/Nicaraguan/International Terrorism challenge to the United States."[2] To lend plausibility to his assertion, McGehee's article proceeded "to review a few examples of ... CIA disinformation programs" in Iran, Vietnam, Chile, and Indonesia.[3] Four days later, on March 24, 1981, the CIA notified McGehee that portions of his article contained "secret" information, and accordingly withheld permission to publish those portions.

The CIA employs three classification levels. The most sensitive information—information that, if disclosed, "reasonably could be expected to cause exceptionally grave damage to the national security"—the CIA classifies "Top Secret." Exec. Order No. 12,065 § 1–102, 3 C.F.R. 190, 191 (1979) (current version at Exec. Order No. 12,356 § 1.1(a)(1), 3 C.F.R. 166, 167 (1983)).[4] The least restricted, but still sensitive, information—information that, if disclosed, "reasonably could be expected to cause identifiable damage to the national security"—the

1. Secrecy Agreement of Ralph W. McGehee ¶ 3 (June 24, 1952), *reprinted in* Joint Appendix (J.A.) at 42.

2. Complaint app. A ("CIA Operations in El Salvador"), J.A. at 8.

3. *Id.* at 8–14.

4. At the time McGehee submitted his article to the CIA, classification decisions were governed by Exec. Order No. 12,065, 3 C.F.R. 190 (1979), which has since been superseded by Exec. Order No. 12,356, 3 C.F.R. 166 (1983). The new

Executive Order does not alter the definitions of "secret" and "top secret" information. However, unlike the former order, which required an articulation of "identifiable damage" to justify a "confidential" classification, the new order requires only a finding of unspecified "damage." *Compare* Exec. Order No. 12,-065 § 1–104, 3 C.F.R. 190, 191 (1979) *with* Exec. Order No. 12,356 § 1.1(a)(3), 3 C.F.R. 166, 167 (1983). We review here only the earlier Executive Order and express no view on the constitutionality of more recent order.

CIA classifies "Confidential." *Id.* § 1–104, 3 C.F.R. at 191.

The CIA classified the censored portions of McGehee's article "Secret." "Secret" is the middle level classification between "Top Secret" and "Confidential":

"Secret" shall be applied only to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security.

*Id.* § 1–103, 3 C.F.R. at 191. The CIA found that McGehee's identification of countries where the CIA had established bases would likely damage U.S. relations with those countries, and that his discussion of the details of a CIA operation in Indonesia would likely disclose secret intelligence methods and help identify secret intelligence sources. The CIA therefore concluded that portions of McGehee's article threatened to cause "serious damage to the national security."

*The Nation* magazine published McGehee's article on April 11, 1981 with the censored portions deleted.[5] McGehee then sought judicial review in the district court, challenging (1) the constitutionality of the CIA's classification and censorship scheme, and (2) the propriety, under that scheme, of classifying portions of his article "secret."

The district court summarily rejected McGehee's constitutional challenge. In the district court's view "the critical question is whether that information has been properly classified and thus [is] subject to censorship."[6] After a "*de novo* review of the [affidavits] submitted for *in camera* inspection" by the parties, and "exercis[ing] judicial deference to the administrative expertise" of the CIA, the district court found that the CIA had "properly classified the documents and [was] warranted in [its] censorship."[7]

In this court, McGehee renews his claim that the CIA classification and censorship scheme violates the first amendment, and

that, even if the scheme is constitutional, the CIA improperly classified portions of his article.

We affirm, holding that (1) when balanced against the first amendment interests in public disclosure of former agents' writings, the CIA scheme of classifying and censoring "secret" information is constitutional because (a) the government has a substantial interest in assuring secrecy in the conduct of foreign intelligence operations, and (b) the criteria for what constitutes "secret" information are neither overbroad, considering the governmental interest the scheme protects, nor excessively vague, considering the particularity with which the criteria offer guidance to the censor; (2) in reviewing whether specified information reasonably could be expected to cause actual serious harm if divulged, courts should accord deference to the CIA's reasoned explanation of its classification decision; and (3) in this case, the CIA properly classified the censored portions of McGehee's article.

## II. The Constitutional Standard for Reviewing the Censorship Scheme

■ In *Snepp v. United States,* 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L.Ed.2d 704 (1980) (per curiam), the Supreme Court held that the CIA could, consistent with the first amendment, recover damages for breach of a secrecy agreement under which a former agent promised to submit CIA-related writings to the CIA for prepublication clearance. The Court found the secrecy agreement to be "a reasonable means for protecting" the "secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service. *Id.* In *Snepp,* the former agent published CIA-related information without submitting his manuscript for prepublication review. The government's action in *Snepp,* therefore,

---

**5.** McGehee, *The C.I.A. and the White Paper on El Salvador,* Nation, Apr. 11, 1981, at 423.

**6.** *McGehee v. Casey,* No. 81–0734, mem. op. at 2 (D.D.C. Sept. 25, 1981).

**7.** *Id.* at 3.

did "not depend upon whether [Snepp's] book actually contained classified information .... The Government simply claim[ed] that ... Snepp should have given the CIA an opportunity to determine whether the material he proposed to publish would compromise classified information or sources." *Id.* at 511, 100 S.Ct. at 766.

In this case, by contrast, McGehee adhered to his secrecy agreement. He submitted his manuscript for prepublication review, and deleted portions of his article in accordance with the CIA's orders. At issue here is the constitutionality of the CIA's substantive criteria and scheme for deciding how to classify, and thereby censor, writings of former agents.

We note, to begin with, that McGehee's secrecy agreement applies only when he seeks to publish "classified information" that "has come or shall come to [his] attention by virtue of [his] connection with the Central Intelligence Agency." [8] The agreement does not extend to unclassified materials or to information obtained from public sources. The government may not censor such material, "contractually or otherwise." *United States v. Marchetti,* 466 F.2d 1309, 1313 (4th Cir.), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972). The government has no legitimate interest in censoring unclassified materials. Moreover, when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated.[9] *Accord Snepp v. United States,* 444 U.S. at 513 n. 8, 100 S.Ct. at 767 n. 8 (dictum) ("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned").

As in McGehee's case, the CIA requires all of its employees to enter into a secrecy agreement as a condition of employment.[10] This fact is critical to our first amendment analysis because numerous Supreme Court decisions establish that:

> [T]he State has interests as an employer in regulating the speech of employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem ... is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the

---

**8.** Secrecy Agreement, *supra* note 1, ¶¶ 2, 3, J.A. at 42. The secrecy agreement used more recently by the CIA requires former CIA agents to submit all CIA-related writings for prepublication review. *See Snepp v. United States,* 444 U.S. at 507–08, 100 S.Ct. at 764 (quoting secrecy agreement signed in 1968). McGehee's agreement does not explicitly require him to preclear all such publications, but he does not contest the preclearance requirement.

**9.** An ex-agent should demonstrate, however, at an appropriate time during the prepublication review, that such information is in the public domain. The CIA cannot reasonably bear the burden of conducting an exhaustive search to prove that a given piece of information is not published anywhere.

McGehee offered in his *in camera* affidavit to attribute one bit of deleted information to a previously published source. The affidavits do not resolve whether McGehee adequately informed the CIA during the prepublication period of his public source or of his willingness to make the attribution. We need not remand for a factual determination, however, because McGehee failed to pursue the issue in his brief to this court.

**10.** It makes no difference to our analysis whether the government seeks to restrict the speech rights of its employees by individual contract or by a broad rule applicable to a class of employees. Either way, the government may not impose unconstitutional conditions on government employment:

> "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit ... [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."

*Branti v. Finkel,* 445 U.S. 507, 514–15, 100 S.Ct. 1287, 1292–93, 63 L.Ed.2d 574 (1980) (quoting *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972)).

An explicit contract may, however, affect the remedies available to the government for breach of a constitutionally valid restriction. The *Snepp* Court, 444 U.S. at 515 n. 11, 100 S.Ct. at 768 n. 11, left open the question whether a constructive trust remedy would have been appropriate absent an express agreement between Snepp and the CIA.

efficiency of the public services it performs through its employees.

*Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *see Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983) (quoting *Pickering*). We must, then, apply a balancing test in determining whether the CIA's censorship of ex-agents' writings violates the first amendment.

The *Snepp* Court discussed the relevant balancing standard as if it were well settled:

> [T]his Court's case makes clear that . . . the CIA [can] act[ ] to protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment.

444 U.S. at 509 n. 3, 100 S.Ct. at 765 n. 3 (1980). A review of relevant cases, however, shows that the precise standard for balancing is not that well settled.

In *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Supreme Court upheld the Hatch Act's proscription on partisan politicking by government employees. In doing so, the Court quoted the *Pickering* balancing test and then provided the terse explanation that:

> [T]he balance [Congress] has . . . struck is sustainable by the obviously important interests sought to be served by the . . . Hatch Act.

413 U.S. at 564, 93 S.Ct. at 2890. The Court concluded with a lengthy analysis of the statute, construing it narrowly to avoid overbreadth and vagueness problems. *Id.* at 568–81, 93 S.Ct. at 2892–98.

*Cole v. Richardson,* 405 U.S. 676, 92 S.Ct. 1332, 31 L.Ed.2d 593 (1972), the culmination of a series of Supreme Court cases reviewing loyalty oaths required of government employees, sheds some additional light on the proper balancing standard. Under *Cole,* a loyalty oath must not require an employee to forego "protected speech activities" and must not be unduly vague; moreover, inquiry into associational activities must be "narrowly confined" to avoid infringement upon constitutional rights. *Id.* at 680, 92 S.Ct. at 1335.

More closely related to the case before us is *Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). There the Court upheld against a first amendment challenge an Air Force regulation that prohibited " 'any [Air Force] member . . . in uniform or . . . in a foreign country' from soliciting signatures on a petition without first obtaining authorization from the appropriate commander," *id.* at 349, 100 S.Ct. at 597 (quoting Air Force Reg. 30–1(9) (1971)), and provided that " '[n]o member of the Air Force will distribute or post any printed or written material . . . within any Air Force installation without permission of the commander . . . ,' " *id.* at 349–50, 100 S.Ct. at 597 (quoting Air Force Reg. 35–15(3)(a)(1) (1970)). The Court upheld this scheme of precirculation clearance because it "protect[s] a substantial Government interest unrelated to the suppression of free speech," *id.* at 354, 100 S.Ct. at 599, namely, the " 'overriding demands of discipline and duty' " in the military services, *id.* (quoting *Parker v. Levy,* 417 U.S. 733, 744, 94 S.Ct. 2517, 2556, 41 L.Ed.2d 439 (1974)). Moreover, the Court found that the regulations "restrict speech no more than is reasonably necessary to protect th[is] substantial governmental interest." *Id.* at 355, 100 S.Ct. at 600.

We discern from these cases two consistent themes, best articulated in *Brown v. Glines.* First, restrictions on the speech of government employees must "protect a substantial government interest unrelated to the suppression of free speech."[11] *Id.* at

---

11. We also detect in the Court's opinions a sensitivity to the special institutional needs of particular governmental services, such as the military and the foreign intelligence services. One who enters the military thereby becomes a member of "a specialized society separate from civilian society," *Brown v. Glines,* 444 U.S. at 354, 100 S.Ct. at 599 (quoting *Parker v. Levy,* 417 U.S. at 743, 94 S.Ct. at 2555), where the demands of preparedness "insist upon a respect for duty and a discipline without counterpart in civilian life," *id.* (quoting *Schlesinger v.*

354, 100 S.Ct. at 599; *see Snepp,* 444 U.S. at 509 n. 3, 100 S.Ct. at 765 n. 3 ("substantial government interest"); *National Association of Letter Carriers,* 413 U.S. at 564, 93 S.Ct. at 2890 ("important interests"). Second, the restriction must be narrowly drawn to "restrict speech no more than is necessary to protect the substantial government interest." *Brown v. Glines,* 444 U.S. at 355, 100 S.Ct. at 600; *see National Association of Letter Carriers,* 413 U.S. at 580, 93 S.Ct. at 2897 (Hatch Act not impermissibly overbroad); *Cole v. Richardson,* 405 U.S. at 680, 92 S.Ct. at 1335 (loyalty oath must be narrowly confined).

With these two principles in mind, we now turn to examine the CIA scheme for classification and censorship of "secret" information.

III. THE CONSTITUTIONAL STANDARD
APPLIED TO THE CIA SCHEME FOR
"SECRET" INFORMATION

■ The CIA classified portions of McGehee's articles as "secret," believing that disclosure "reasonably could be expected to cause serious damage to the national security." Exec. Order No. 12,065 § 1–103, 3 C.F.R. 190, 191 (1979). We hold that the CIA censorship of "secret" information contained in former agents' writings and obtained by former agents during the course of CIA employment does not violate the first amendment.

The censorship of "secret" information "protect[s] a substantial governmental interest unrelated to the suppression of free expression." *Brown v. Glines,* 444 U.S. at 354, 100 S.Ct. at 599. Indeed, the government "has a *compelling* interest in protecting ... the secrecy of information important to our national security ...." *Snepp v. United States,* 444 U.S. at 509 n. 3, 100 S.Ct. at 765 n. 3 (emphasis added). Information properly classified as "secret" does possess such importance by virtue of its potential for causing "serious damage to the national security."

Further, the classification criteria for "secret" information reasonably confine the resulting censorship to cases in which a substantial governmental interest is served. The criteria do not sweep too broadly because they impede disclosure only when it poses a reasonable probability of "serious" harm. In addition, as the following discussion explains, the classification criteria are not excessively vague.

The term "national security" is defined for classification purposes as "the national defense and foreign relations of the United States." So defined, the term is inherently vague. *See Halperin v. Kissinger,* 606 F.2d 1192, 1200 (D.C.Cir.1979), *aff'd by an equally divided Court,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981); *cf. United States v. United States District Court,* 407 U.S. 297, 314, 320, 92 S.Ct. 2125, 2135, 2138, 32 L.Ed.2d 752 (1972) (noting the "inherent vagueness of the domestic security concept"); *Zweibon v. Mitchell,* 516 F.2d 594, 653–54 (D.C.Cir.1975) (en banc) (the concept "affecting foreign relations" vague and subject to abuse). In this case, however,

*Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975)). Similarly, one who enters the foreign intelligence service thereby occupies a position of "special trust" reached by few in government, *Snepp,* 444 U.S. at 511 & n. 6, 100 S.Ct. at 766 & n. 6, where the demands of international affairs insist upon a measure of secrecy "essential to the security of the United States and—in a sense—the free world," *id.* at 512 n. 7, 100 S.Ct. at 767 n. 7.

Secrecy in international relations has long been acknowledged to be essential to the functioning of the national government. *See, e.g., New York Times Co. v. United States,* 403 U.S. 713, 728, 91 S.Ct. 2140, 2148, 29 L.Ed.2d 822 (Stewart, J., concurring) ("it is elementary that the successful conduct of international diplo-

macy and the maintenance of an effective national defense require both confidentiality and secrecy"); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936) (the President "has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results"); The Federalist No. 64, at 434–36 (J. Jay) (J. Cooke ed. 1961) ("So often and so essentially have we heretofore suffered from want of secrecy and dispatch [in international negotiations], that the Constitution would have been inexcusably defective if no attention had been paid to those objects.").

the governing Executive Order adds specificity to the definition by enumerating the types of information that may be considered for classification:

> Information may not be considered for classification unless it concerns:
>
> (a) military plans, weapons, or operations;
>
> (b) foreign government information;
>
> (c) intelligence activities, sources or methods;
>
> (d) foreign relations or foreign activities of the United States;
>
> (e) scientific, technological, or economic matters relating to the national security;
>
> (f) United States Government programs for safeguarding nuclear materials or facilities; or
>
> (g) other categories of information which are related to national security and which require protection against unauthorized disclosure as determined by the President, by a person designated by the President . . ., or by an agency head.[12]

Exec. Order No. 12,065 § 1–301, 3 C.F.R. 190, 193 (1979).

To be sure, this attempt to limit the classification of documents has its shortcomings. In particular, item (e) refers back to the concept of national security itself, thereby undermining the attempt to eliminate vagueness, and item (g) grants roving classification authority to specified individuals. The CIA, however, did not invoke items (e) or (g) in this case.[13] We therefore need not consider today whether classification decisions that place great reliance upon items (e) or (g) would be defective due to the asserted vagueness of the Executive Order.[14]

Item (d) also refers broadly to "foreign relations or foreign activities of the United States." Standing alone, such a classification standard might be excessively vague. See *Zweibon v. Mitchell*, 516 F.2d at 653–55. The CIA, however, has articulated narrower standards to guide classification decisions under item (d). *See* Agency Information Security Program Handbook: Classifying, Declassifying, Marking and Safeguarding

---

**12.** The Executive Order currently in effect uses a longer and somewhat more specific list of potentially classifiable material. *See* Exec. Order No. 12,356 § 1.3(a), 3 C.F.R. 166, 168–69 (1983):

> Information shall be considered for classification if it concerns:
> (1) military plans, weapons, or operations;
> (2) the vulnerabilities or capabilities of systems, installations, projects, or plans relating to the national security;
> (3) foreign government information;
> (4) intelligence activities (including special activities), or intelligence sources or methods;
> (5) foreign relations or foreign activities of the United States;
> (6) scientific, technological, or economic matters relating to the national security;
> (7) United States Government programs for safeguarding nuclear materials or facilities;
> (8) cryptology;
> (9) a confidential source; or
> (10) other categories of information that are related to the national security and that require protection against unauthorized disclosure as determined by the President or by agency heads or other officials who have been delegated original classification authority by the President.

**13.** *See* Defendant's Statement of Material Facts As To Which There Is No Genuine Issue ¶ 5, J.A. at 24.

**14.** The Executive Order provides further guidance in, e.g., § 1–101, 3 C.F.R. 190, 191 (1979) ("reasonable doubt" about classification level to be resolved in favor of nonclassification or classification at a less restrictive level), *superseded by* Exec. Order No. 12,356 § 1.1(c), 3 C.F.R. 166, 167 (1983) (reasonable doubt to be resolved by obtaining a second opinion); *id.* § 1–601, 3 C.F.R. at 194 (classification may not be used "to conceal violations of law, inefficiency, or administrative error, [or] to prevent embarrassment to a person, organization or agency") (current version at Exec. Order No. 12,356 § 1.6(a), 3 C.F.R. 166, 170 (1983) (adding that classification may not be used "to restrain competition; or to prevent or delay the release of information that does not require protection in the interest of national security")); *id.* § 1–602, 3 C.F.R. at 194 ("Basic scientific research information not clearly related to the national security may not be classified.") (current version at Exec. Order No. 12,356 § 1.6(b), 3 C.F.R. 166, 170 (1983) (no change)); and *id.* § 6–103, 3 C.F.R. at 204 (defining "foreign government information") (current version at Exec. Order No. 12,356 § 6.1(d), 3 C.F.R. 166, 177 (1983) (expanding the former definition)).

National Security Information, HHB No. 70–2 ¶ 9d (Nov. 28, 1978). The guidelines pertinent to this case [15] are sufficiently precise to withstand a challenge for unconstitutional vagueness.

Moreover, one of the principal dangers of imprecise standards is that they may deter legitimate expression. When an administrative scheme is designed to avoid the deterrence of legitimate speech, however, that danger is alleviated in part. Thus in *Civil Service Commission v. National Association of Letter Carriers,* the Supreme Court rejected a vagueness challenge to the Hatch Act, in part because:

> the Commission ha[d] established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law . . . .

413 U.S. at 580, 93 S.Ct. at 2897–98. Similarly, in this case the Executive Order, by establishing a preclearance procedure for determining whether intended publications contain classified material, engenders less of a chilling effect on free speech. This is not to say, of course, that imprecise standards would not still present an intolerable burden by allowing the censor unwarranted discretion in vetoing material, but, as we have said, we do not find the standards for classifying material as "secret" unconstitutionally vague. And we note that the agent may seek judicial review of the CIA's classification decision.[16]

■ Finally, McGehee argues that the classification standard for "confidential" information—"information, the unauthorized disclosure of which reasonably could be expected to cause identifiable damage to the national security"—should be invalidated because it is "too broad and vague to satisfy the First Amendment."[17] Because, as explained below, McGehee lacks standing to assert overbreadth and vagueness challenges to the "confidential" standard, we need not consider them in this case.

The censored portions of McGehee's writings were classified "secret," not "confidential."[18] Thus he attempts to challenge the

---

**15.** *See, e.g.,* Agency Information Sec. Program Handbook, *supra* ¶ 9d(1) ("Information that, if disclosed, could lead to foreign political, economic, or military action against the United States or other friendly nations."); *id.* ¶ 9d(5) ("Information that could identify or otherwise disclose activities abroad in support of national foreign policy objectives, and planned and executed so that the role of the United States Government is not apparent or acknowledged publicly; or information that could reveal support for such activities."); *id.* ¶ 9d(7) ("Information that, if disclosed, could lead to political or economic instability, or to civil disorder or unrest, in a foreign country or could jeopardize the lives, liberty, or property of United States citizens residing in or visiting such a country or could endanger United States Government personnel or installations there.").

**16.** *See Snepp v. United States,* 444 U.S. at 513 n. 8, 100 S.Ct. at 767 n. 8 ("Snepp's contract . . . requires no more than a clearance procedure subject to judicial review."); *see also New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam) (permitting publication of Pentagon Papers despite government's claim that they were "top secret"); *Haig v. Agee,* 453 U.S. 280, 289 n. 17, 101 S.Ct. 2766, 2773, 69 L.Ed.2d 640 (1981) (President's plenary power over foreign relations, "like every other government power,

must be exercised in subordination to the applicable provisions of the Constitution.") (quoting *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936)); Comment, *Snepp v. United States: The CIA Secrecy Agreement and the First Amendment,* 81 Colum.L.Rev. 662, 689–90 & n. 185 (1981).

Also, in a proper case the broad terms in the Executive Order might be narrowed by judicial construction.

**17.** Appellant's Brief at 13.

**18.** McGehee argues in his brief:

> The measure of harm which the CIA asserts in its Rule 1–9(h) statement corresponds to the level for classifying information "confidential." The CIA's affiant states that the censored portions of McGehee's article are classified "secret," . . . . Notwithstanding the statements of the affiant, the assertion made in defendant's Rule 1–9(h) statement is controlling for the purpose of this litigation. *See Gardels v. CIA,* 637 F.2d 770 (D.C.Cir. 1980).

Appellant's Brief at 13 n. *. We disagree for two reasons.

First, the CIA's Statement of Material Facts As To Which There Is No Genuine Issue Pursuant to Local Rule 1–9(h) (1–9(h) Statement)

Executive Order on the ground that it may conceivably be unconstitutionally applied to others, in situations other than his own. Generally, litigants may not properly raise such claims. *See, e.g., Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973); *United States v. Raines,* 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524 (1960). When the litigant asserts a first amendment challenge, however, courts sometimes make an exception and hear "attacks on overly broad [rules] with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a [rule] drawn with the requisite narrow specificity." *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965).

This exception, however, does not extend automatically to all first amendment challenges. Courts devised the exception "because of a judicial prediction or assumption that the [rule]'s very existence may cause others not before the court to refrain from constitutionally protected speech." *Broadrick v. Oklahoma,* 413 U.S. at 612, 93 S.Ct. at 2916. Accordingly, overbreadth analysis should not be deployed when a limiting construction could save the rule from its constitutional defects, *see, e.g., Dombrowski v. Pfister,* 380 U.S. at 491, 85 S.Ct. at 1123; *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), or when its deterrent effect is neither real nor substantial, *see, e.g., Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49

L.Ed.2d 310 (1976); *Broadrick v. Oklahoma,* 413 U.S. at 615, 93 S.Ct. at 2917.

In this case, the Executive Order does, under some constructions, touch constitutionally protected speech. As McGehee observes, "identifiable damage" might include "a minimal amount of harm which may not be sufficient in all cases to justify suppression of speech." [19] Yet future construction of the order [20] could reasonably delimit the scope of the order. The CIA or a reviewing court might formulate standards for "confidential" information that require damage to "important . . . national security" interests. *Snepp v. United States,* 444 U.S. at 509 n. 3, 100 S.Ct. at 765 n. 3. Alternatively, the classification scheme might be narrowed to exclude much of what falls under the rubric of "confidential" materials. To paraphrase the Supreme Court, "[e]ven if the ['confidential' standard] were to be considered in some respects unconstitutionally overbroad, we would not invalidate the entire [classification scheme]. The remainder of the [scheme] . . . covers a whole range of . . . constitutionally proscribable . . . conduct." *Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. at 580–81, 93 S.Ct. at 2897–98.

We also conclude that the classification scheme, taken as a whole, does not result in real or substantial deterrence of protected speech. The "secret" and "top secret" classifications place constitutional burdens on the speech of former CIA agents. We are not prepared to hold today that the burdens

---

does not say that the CIA classified portions of McGehee's article "confidential." Rather, it states that the deleted portions of McGehee's article "could reasonably be expected to cause *at least* specific and identifiable harm to the national security . . . ." CIA 1–9(h) Statement ¶¶ 6–11, J.A. at 24–25 (emphasis added). This statement is consistent with the CIA affiant's explanation that the relevant information is classified "secret."

Second, *Gardels v. CIA, supra,* does not stand for the proposition that the assertions made in 1–9(h) statements eclipse all other consistent statements. In *Gardels,* this court found the CIA's 1–9(h) statement defective because it "fail[ed] . . . to specify the material facts upon which [the CIA] relie[d] and merely incorporate[d] entire affidavits and other mate-

rials without reference to the particular facts recited therein . . . ." 637 F.2d at 773. Moreover, in *Gardels* the CIA on appeal attempted to rely upon deposition testimony introduced after its 1–9(h) statement, thereby denying the plaintiff an opportunity to respond adequately in its counter-statement. *See id.* at 773–74. The CIA committed neither error in this case.

**19.** Appellant's Brief at 15.

**20.** We also note that McGehee asks this court to engage in overbreadth analysis of an order that is no longer in effect. Insofar as the superseding Executive Order differs from the order that controls this litigation, it is wise to defer judicial limiting constructions to another day.

placed on such speech by the "confidential" classification are sufficiently heavy or widespread to render the entire classification scheme substantially overbroad and therefore invalid on its face. *Cf. id.* at 581, 93 S.Ct. at 2898 (same conclusion regarding an overbreadth challenge to the Hatch Act on the grounds that a prohibition against political endorsements, not applied to the plaintiff, rendered the entire statute void). In addition, as we noted above, the CIA classification and censorship scheme reduces deterrence, because prepublication review alleviates a former agent's fear that his disclosure of non-sensitive information might result in liability. Thus the CIA's scheme reduces any disfavored chilling effect.

■■■ McGehee also lacks standing to challenge the "confidential" standard for vagueness. A litigant cannot properly challenge a rule for vagueness when it clearly applies to him. *See Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.").

Accordingly, we uphold against first amendment challenge the CIA classification and censorship scheme for "secret" information. We decline to rule whether the "confidential" standard passes constitutional muster because McGehee lacks standing to mount such a challenge. We now turn to the question whether the CIA properly classified portions of McGehee's article as "secret."

## IV. THE STANDARD FOR JUDICIAL REVIEW OF INDIVIDUAL CIA CENSORSHIP DECISIONS

The district court found that the CIA "properly classified the [relevant] documents and [was] warranted in their censorship" of portions of McGehee's article.[21]

**21.** *McGehee v. Casey, supra* note 6, at 3.

**22.** Our ruling today merely upholds the CIA secrecy agreement and determines that the CIA properly classified the deleted items in McGehee's article. The CIA has not sought an injunction against publication of the censored items. *See Snepp v. United States,* 444 U.S. at 513 n. 8, 100 S.Ct. at 767 n. 8 (distinguishing injunctive proceedings from review of prepubli-

We agree, although we take this opportunity to clarify the standard of judicial review appropriate to a case such as this one.

This case arises in a posture significantly different from a request for release of CIA documents under the Freedom of Information Act (FOIA). In a FOIA case, an individual seeks to compel release of documents in the government's possession. Here, by contrast, McGehee wishes publicly to disclose information that he already possesses, and the government has ruled that his secrecy agreement forbids disclosure.

■■■ This difference between seeking to obtain information and seeking to disclose information already obtained raises McGehee's constitutional interests in this case above the constitutional interests held by a FOIA claimant. As a general rule, citizens have no first amendment right of access to traditionally nonpublic government information. *See, e.g., Houchins v. KQED, Inc.,* 438 U.S. 1, 8–9, 98 S.Ct. 2588, 2593, 57 L.Ed.2d 553 (1978) (plurality opinion); *id.* at 16, 98 S.Ct. at 2597 (Stewart, J., concurring); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 849, 94 S.Ct. 2811, 2814, 41 L.Ed.2d 514 (1974); *Pell v. Procunier,* 417 U.S. 817, 831–32, 94 S.Ct. 2800, 2808–09, 41 L.Ed.2d 495 (1974). A litigant seeking release of government information under FOIA, therefore, relies upon a statutory entitlement—as narrowed by statutory exceptions—and not upon his constitutional right to free expression.

■■ In this case, however, McGehee wishes to publish information he possesses, and the CIA wishes to silence him. Although neither the CIA's administrative determination nor any court order in this case constitutes a prior restraint in the traditional sense upon McGehee or any other party,[22]

cation clearance decisions). If the CIA did seek judicial action to restrain publication, it would bear a much heavier burden. *See id.; New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (per curiam); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). The Supreme Court has long observed that "the chief purpose of [the

the entire scheme of prepublication review is designed for the purpose of preventing publication of classified information. McGehee therefore has a strong first amendment interest in ensuring that CIA censorship of his article results from a *proper* classification of the censored portions. *Cf. Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362, 1367 (4th Cir.) ("the deletion items should be suppressed only if they are found to be both classified and classifiable under the Executive Order"), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 482 (1975).

We must accordingly establish a standard for judicial review of the CIA classification decision that affords proper respect to the individual rights at stake while recognizing the CIA's technical expertise and practical familiarity with the ramifications of sensitive information. We conclude that reviewing courts should conduct a *de novo* review of the classification decision, while giving deference to reasoned and detailed CIA explanations of that classification decision.

We begin with an examination of the standard employed in the review of FOIA requests for classified information, because the scope of judicial review in this case should be at least that broad. The FOIA calls for *de novo* judicial review of an agency decision, and places the burden on the agency to justify its claim of exemption. 5 U.S.C. § 552(a)(4)(B). *See, e.g., Salisbury v. United States,* 690 F.2d 966, 970 (D.C.Cir. 1982); *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981). At the same time, courts are to "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record" because "the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of a particular classified record." S.Rep. No. 1200, 93d Cong., 2d Sess. 12, U.S.Code & Admin.News 1974, p. 6267 (1974) (Conference Report on the FOIA Amendments).

This circuit has on many occasions reviewed whether the denial of a FOIA request properly fell within the FOIA exemption for classified documents. 5 U.S.C. § 552(b)(1). In these cases, we have established that CIA explanations for its classification decisions should be neither "conclusory, merely reciting statutory standards, [nor] too vague [n]or sweeping." *Hayden v. National Security Agency,* 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). At the same time, "[o]nce satisfied that the proper procedures have been followed and that the information logically falls into the exemption claimed, the courts 'need not go further to test the expertise of the agency, or to question its veracity when nothing appears to raise the issue of good faith.'" *Gardels v. Central Intelligence Agency,* 689 F.2d 1100, 1104–05 (D.C.Cir.1982) (quoting *Weissman v. Central Intelligence Agency,* 565 F.2d 692, 697 (D.C.Cir.1977)); *see also Halperin v. Central Intelligence Agency,* 629 F.2d 144, 148 (D.C.Cir.1980). Similarly, in *Alfred A. Knopf, Inc. v. Colby, supra,* the Fourth Circuit, after invoking the FOIA standard, announced a "presumption of regularity" for CIA classification decisions. 509 F.2d at 1368.

■ Because the present case implicates first amendment rights, however, we feel compelled to go beyond the FOIA standard of review for cases reviewing CIA censorship pursuant to secrecy agreements. While we believe courts in securing such determinations should defer to CIA judgment as to the harmful results of publication, they must nevertheless satisfy themselves from the record, *in camera* or otherwise, that the CIA in fact had good reason to classify, and therefore censor, the materials at issue. Accordingly, the courts should require that CIA explanations justify censorship with reasonable specificity, demonstrating a logical connection between the deleted information and the reasons for classification. These should not rely on a "presumption of regularity" if such rational

first amendment's] guaranty [is] to prevent previous restraints upon ·publication." *Near v.*

*Minnesota,* 283 U.S. 697, 713, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931).

explanations are missing. We anticipate that *in camera* review of affidavits, followed if necessary by further judicial inquiry, will be the norm. *Cf. Hayden v. National Security Agency*, 608 F.2d at 1387 ("*in camera* review is neither necessary nor appropriate" in FOIA cases once the agency demonstrates "(1) that it followed proper classification procedures, and (2) that by its description the document logically falls within the claimed exemption"). Moreover, unlike FOIA cases,[23] in cases such as this both parties know the nature of the information in question. Courts should therefore strive to benefit from "criticism and illumination by [the] party with the actual interest in forcing disclosure." *Vaughn v. Rosen*, 484 F.2d 820, 825 (D.C.Cir.1973) (describing the defects in the FOIA procedures), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). This was, in fact, the procedure employed by the district court here.[24]

We are, of course, well aware that judicial review of CIA classification decisions, by reasonable necessity, cannot second-guess CIA judgments on matters in which the judiciary lacks the requisite expertise. Due to the "mosaic-like nature of intelligence gathering," *Salisbury v. United States*, 690 F.2d at 971, for example, "[w]hat may seem trivial to the uninformed[ ] may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in context," *United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir.), *cert. denied*, 409

U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972). But while the CIA's tasks include the protection of the national security and the maintenance of the secrecy of sensitive information, the judiciary's tasks include the protection of individual rights. Considering that "speech concerning public affairs is more than self-expression; it is the essence of self-government,"[25] and that the line between information threatening to foreign policy and matters of legitimate public concern is often very fine,[26] *see New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), courts must assure themselves that the reasons for classification are rational and plausible ones.

## V. THE APPLICATION OF THE STANDARD TO THIS CASE

■ We have made such a judgment in this case, and, after examining the detailed *in camera* affidavits of the parties, we conclude that the CIA properly classified the information at issue. The CIA affidavits give us reason to believe that disclosure of the censored portions of McGehee's article could reasonably be expected to cause serious damage to the national security. The affidavit offers reasonably convincing and detailed evidence of a serious risk that intelligence sources and methods would be compromised by disclosures proposed by McGehee. We also believe, on the basis of plausible scenarios put forward in the CIA affidavit, that the United States could suffer significant strategic and diplomatic set-

---

**23.** This circuit has devised a system that employs "detailed public justifications" by the CIA and rebuttal by the FOIA claimant, in an attempt to create some semblance of adversarial process. *See Phillippi v. Central Intelligence Agency*, 546 F.2d 1009, 1013 (D.C.Cir.1976).

**24.** We accordingly reject McGehee's claim that the district court improperly gave "conclusive deference" to the CIA in this case. Appellant's Brief at 33.

**25.** *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964); *see NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982) (speech on public issues occupies the "highest rung of the hierarchy of First Amend-

ment values"); A. Meiklejohn, *Free Speech and its Relation to Self-Government* (1948).

**26.** *Cf. DeJonge v. Oregon*, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278 (1937) ("The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government.").

backs as a result of the disclosure of the deleted information. These risks identified in the CIA affidavits do not, of course, rise to the level of certainty, but we believe they are real and serious enough to justify the classification decision in this case.

Accordingly, the judgment of the district court is

*Affirmed.*

Separate Statement of WALD, Circuit Judge:

The Supreme Court has ruled that secrecy contracts, such as the one involved here, are a legal condition of CIA employment; today this court finds that the "secret" classification censorship scheme employed by the CIA has been constitutionally applied in this case.

I write separately to stress, however, that neither the agency's nor our analysis takes account of any separate public right to know critical albeit classified facts about the activities of our intelligence agencies.[1] *See Afshar v. CIA*, 702 F.2d 1125 (D.C.Cir. 1983); *cf. N.Y. Times v. United States*, 403 U.S. 713, 728–30, 91 S.Ct. 2140, 2148–49, 29 L.Ed.2d 822 (1970) (Stewart, J., concurring). It would of course be extremely difficult for judges to "balance" the public's right to know against an acknowledged national security risk, and I do not believe we are currently authorized to do so. However, it seems important in view of recent revelations about past indiscretions in the name of national security, for some governmental institution, if not the classification system itself, to conduct such a balance. As Emerson explained, "history ... give[s] value to the present hour and its duty." By not weighing the value to the public of knowing about particularly relevant episodes in the

intelligence agencies' history, we may undermine the public's ability to assess the government's performance of its duty. Economic and criminal sanctions against agents who violate the preclearance and agency classification scheme are justifiable. But with no mechanism in the system for balancing the public's right to know with possible risks to security, those sanctions can also result in the permanent loss of information critical to public debate. Our decision today, reflecting current restraints on our authority, cannot and does not fill the public's need for such a balance.

MacKINNON, Senior Circuit Judge (concurring specially):

I concur generally in the foregoing opinion but not wholly in the statement in n. 22 that under *Snepp v. United States, supra,* there is an essential difference between upholding the secrecy agreement as to the classified information here and a case where the government might seek a prepublication injunction of the same information. In the first place, the statement in footnote 22 is not necessary to the decision of this case. Second, to my mind the two types of cases are essentially the same and the citation in support of that distinction provides weak support for the assertion. *See Snepp v. United States,* 444 U.S. at 513, n. 8, 100 S.Ct. at 767, n. 8.

The cited footnote in *Snepp* merely states that absent an arrival at a good-faith agreement between the Central Intelligence Agency and Snepp under the agency's clearance procedure, "the Agency would have borne the burden of seeking an injunction against publication." *Id.* (citations omitted). Thus the Court's language said *nothing* of the weight of that burden, and certainly did *not* mandate "a much heavier

---

1. In the district court and in his initial brief to this court, McGehee asserted that the CIA failed to follow the procedure, mandated by an Executive Order then in effect, for the declassification of information when "the public interest in disclosure outweighs the damage to national security that might reasonably be expected from disclosure." Exec. Order No. 12,065 § 3–303, 3 C.F.R. 190, 197 (1979); *see* Appellant's Brief at 31–33. However, subsequent Executive Order No. 12,356, 3 C.F.R. 166 (1983), repealed this balancing provision, and in *Afshar v. CIA, infra,* this court found to be moot the issue whether the CIA had failed previously to follow the now repealed provision. In light of these developments, McGehee abandoned his claims based upon this balancing provision. Reply Brief for Appellants at 1–2.

burden," as Judge Wald's footnote 22 would have us believe. *Any* party seeking *any* injunction bears some burden. I would consider that enforcement of McGehee's voluntary contractual agreement not to reveal classified information is more akin to the right of an author to enjoin the publication of copyrighted matter. In *Westermann Co. v. Dispatch Co.,* 249 U.S. 100, 39 S.Ct. 194, 63 L.Ed. 499 (1919), the Supreme Court did not interfere with a district court injunction against the future infringement of certain copyrighted matter. Federal statutes also specifically authorize the issuance and enforcement of injunctions to restrain infringement of a copyright. 17 U.S.C. § 502, 90 Stat. 2584. *See, e.g., Dodd, Mead & Co. v. Lilienthal,* 514 F.Supp. 105 (S.D.N.Y.1981) (injunction granted: no first amendment right to breach exclusive publication contract); *Encyclopaedia Brittanica, etc. v. Crooks,* 447 F.Supp. 243 (W.D.N.Y. 1978).

Footnote 22 also cites *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), but the concurring opinions of Justices Stewart and White in that case narrow their concurrence with respect to the absolute nature of the restriction on prior restraint. 403 U.S. at 729–730, 731, 737, 91 S.Ct. at 2149, 2150, 2153. Justice Stewart remarked:

> [I]t is clear to me that it is the constitutional duty of the Executive—as a matter of sovereign prerogative and not as a matter of law as the courts know law—through the promulgation and enforcement of executive regulations, to protect the confidentiality necessary to carry out its responsibilities in the fields of international relations and national defense.

403 U.S. at 729–30, 91 S.Ct. at 2149. Justice Stewart further indicated that the standard for injunction of publication of such allegedly damaging documents was whether their publication would "surely result in direct, immediate, and irreparable damage to our Nation or its people." 403 U.S. at 730, 91 S.Ct. at 2149. The various opinions in *New York Times,* which involved the so-called Pentagon Papers, draw distinctions between publishing matter that affects the "national interest" and matter that affects "national security." Justice White's remarks also indicate that the newspapers were not expected to publish *all* the material in the Pentagon Papers: "... a responsible press may choose never to publish the more sensitive materials." 403 U.S. at 733, 91 S.Ct. at 2151. Justice White refers to the same material referred to in my separate opinion in *United States v. Washington Post Company,* 446 F.2d 1327, 1329 (1971):

> [B]y agreement of the parties some of the documents will be protected ....

446 F.2d at 1329. (MacKinnon, J.). Thus, the decision in the Pentagon Papers case is not as absolute a prohibition against prior restraint as some assert. As Justice Brennan remarked, it is only an absolute bar to the imposition of judicial restraints in circumstances of the kind presented in those cases—where the attempt to restrain the press was "predicated upon surmise or conjecture that untoward consequences may result." 403 U.S. at 725–26, 91 S.Ct. at 2147.