KATZMANN, Circuit Judge,
concurring in the judgment:
I agree with the majority that Ms. Wilson’s pre-2002 dates of service, if any, were originally properly classified by the CIA, have never been officially declassified, and were never officially disclosed by the CIA. Therefore, I also agree that this Court has no power to free Ms. Wilson from the secrecy agreement that she *197 signed upon commencement of her employment with the CIA. At the same time, I write to observe that the CIA’s position in this litigation blinks reality in light of the unique facts of this case and the policies behind the doctrines at issue here. Indeed, the CIA’s litigation posture may very well be counterproductive to its purposes.
If the February 10, 2006 letter on CIA letterhead had not surfaced in the Congressional Record (“February 10 Letter”), and we were merely faced with the question of whether Ms. Wilson should be permitted to disclose her possible pre-2002 service dates, despite the fact that they were already the subject of widespread media reports, the answer would clearly be no. The same would be true if the question was, even given the publication of the February 10 Letter, whether the CIA should be forced to officially acknowledge any of Ms. Wilson’s possible pre-2002 dates of service. However, that is not this case.
As it appeared in the Congressional Record, the February 10 Letter stated the following:
Dear Mrs. Wilson, This letter is in response to your recent telephone conversation with regarding [sic] when you would be eligible to receive your deferred annuity. Per federal statute, employees ... who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age....
Following is a list of your federal service:
Dates of Service: CIA ... from 11/9/1985 to 1/9/2006 — total 20 years, 7 days.
Please let me know if I can be of any further assistance.
153 Cong. Rec. E119 (daily ed. Jan. 16, 2007).
Further, in connection to this litigation, Karen F. Tumolo submitted an unclassified, public declaration attesting to the fact that she signed the February 10 Letter to Valerie Wilson; at the time she signed the letter she was the Chief of Retirement and Insurance Services at the CIA, responsible for managing the CIA’s retirement and insurance benefits programs; and, in the ordinary course, in responding to a request such as Ms. Wilson’s for information on retirement annuity eligibility, her office would verify that the employee’s status was not classified. However, her declaration further stated, acknowledging the agency’s negligence, that “[t]he employees in my office neglected to perform such a classification review of Ms. Wilson’s personnel file. As a consequence, the summary of Ms. Wilson’s service was not properly marked to indicate that the information was classified.” See Declaration of Karen F. Tumolo, Senior Benefits Specialist, Office of Personnel Resources, Directorate of Support, Central Intelligence Agency ¶ 9.
Relevant case law, developed largely in the context of the Freedom of Information Act, has focused on the harm that could come to national security from an official CIA disclosure of information that has already entered the public domain. Three general concerns have been identified: (1) the benefits that come to the CIA from plausible deniability;[1] (2) the possibility of *198 foreign retaliation;[2] and (3) the effect on the CIA’s intelligence-gathering capabilities, both in terms of intelligence sources and intelligence methods.[3]
The CIA and the majority rely on all three of these concerns in this case. The majority discusses plausible deniability,[4] *199 and CIA Deputy Director Stephen R. Kappes convincingly explains, both in his classified and unclassified declarations, what harm will come to national security, in terms of foreign retaliation and the effect on the CIA’s intelligence-gathering capabilities, if Ms. Wilson’s pre-2002 service dates, if any, are officially acknowledged by the CIA.[5] Mr. Kappes’ reasons are detailed, rational, and plausible on their face; *200 indeed they are compelling. See, e.g., McGehee v. Casey, 718 F.2d 1137, 1148-49 (D.C.Cir.1983).
However, Ms. Wilson is not asking the CIA to officially acknowledge her possible pre-2002 dates of service. The purpose of Mr. Kappes’ classified and unclassified declarations was to describe the harm to national security that would result from the CIA officially acknowledging the information contained in the February 10 Letter. See Declaration of Stephen R. Kappes, Deputy Director, Central Intelligence Agency (“Kappes Deck”) ¶ 3 (“The purpose of this declaration is to describe ... the serious damage to the national security that reasonably could be expected to result if certain information in the 10 February 2006 letter is officially acknowledged by the CIA.”); Classified In Camera, Ex Parte Declaration of Stephen R. Kappes, Deputy Director, Central Intelligence Agency, Secret, dated July 18, 2007, ¶ 3 (unclassified paragraph) (“The purpose of this declaration is to describe ... the classified information that would be revealed if the CIA acknowledged whether Ms. Wilson was employed by the CIA pri- or to 1 January 2002. I also describe in greater detail the serious damage to the national security that reasonably could be expected to result if the CIA acknowledges the classified information in the 10 February 2006 letter.”). Yet the declarations do not address why publication of Ms. Wilson’s memoir would be an official acknowledgment by the CIA.
Moreover, despite the publication of the February 10 Letter on CIA letterhead in the Congressional Record, the declarations make no effort to explain how the harms described would be likely to result from the publication of Ms. Wilson’s book, instead of, or in addition to, the publication of the February 10 Letter itself. Instead, the declarations ignore the February 10 Letter entirely. While it is inherently plausible that a foreign government could learn of an official CIA acknowledgment and conclude that the CIA is not trustworthy, thereby causing harm to our national security, see Kappes Deck ¶ 70, it is not inherently plausible that a foreign government would consider Ms. Wilson’s book, rather than the February 10 Letter coupled with Ms. Tumolo’s public declaration submitted in connection with this case, to be an official acknowledgment by the CIA. Indeed, courts agree that books published by former CIA agents are not official CIA disclosures. See, e.g., Afshar v. Dep’t of State, 702 F.2d 1125, 1133-34 (D.C.Cir.1983) (“Plaintiff points first to a number of books by former CIA agents and officials, all of which were submitted to the agency for prepublication review.... [N]one of the books is an official and documented disclosure, as the release of CIA cables would be.”). Yet the CIA ignores this issue, and, in doing so, assumes away a crucial component in this case.
Finally, if there is “some increment of doubt” regarding the reliability of the February 10 Letter, despite the fact that the CIA submitted a sworn, unclassified, public declaration from the letter’s author stating that the letter had been prepared in the ordinary course of business but was inadvertently not subjected to the normal classification review, it is unclear why the publication of Ms. Wilson’s personal memoir would somehow erase that doubt and authoritatively establish the accuracy of the facts contained in the letter. If anything, Ms. Tumolo, and not Ms. Wilson, is the “official of the United States in a position to know of what [s]he spoke.” See Alfred A. Knopf, Inc. v. Colby, 509 F.2d at 1362, 1370 (4th Cir.1975) (“It is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a *201 position to know of it officially to say that it is so. The reading public is accustomed to treating reports from uncertain sources as being of uncertain reliability, but it would not be inclined to discredit reports of sensitive information revealed by an official of the United States in a position to know of what he spoke.”).
Indeed, the CIA’s position in this litigation, set forth in unclassified, publicly filed court documents, has served only to give credence to the perception that the February 10 Letter accurately set forth Ms. Wilson’s dates of service. Senator Daniel Patrick Moynihan, a student of secrecy, believed that the obvious need to protect legitimate secrets is undermined when agencies proceed reflexively without a fully reasoned assessment of the likely consequences of positions contemplated. See Daniel Patrick Moynihan, Secrecy, with a new preface by the author (1998). This may have been such a case.

. See, e.g., Military Audit Project v. Casey, 656 F.2d 724, 744-45 (D.C.Cir.1981) ("[T]he government argues it still has something to hide; the reported purpose of the Glomar Explorer’s mission may well be notorious, but ... its actual purpose may well still be a secret, or, at the very least, unresolved doubt may still remain in the minds of the United States’ *198 potential and actual adversaries as to the true purpose of the mission.... [E]ven if the true purpose of the mission was in fact to raise a submarine from the floor of the ocean, there may be some advantage in leaving the Soviet intelligence agencies with lingering doubts whether some other purpose motivated the project. Whatever the truth may be, it remains either unrevealed or unconfirmed. We cannot assume ... that the CIA has nothing left to hide. To the contrary, the record before us suggests either that the CIA still has something to hide or that it wishes to hide from our adversaries the fact that it has nothing to hide.”) (footnote omitted).

. See, e.g., Phillippi v. CIA, 655 F.2d 1325, 1332-33 (D.C.Cir.1981) ("[Former Soviet leader Nikita] Khrushchev stated in his Memoirs that what led him to cancel the Paris Summit meeting with President Eisenhower after the U-2 incident [in 1960] was not the fact that American U-2’s had overflown the Soviet Union[-] that was not news to Khrushchev[-] but rather that President Eisenhower had publicly admitted that he had approved the mission.... In the world of international diplomacy, where face-saving may often be as important as substance, official confirmation of the purpose of the Glomar Explorer project ... could have an adverse effect on our relations with the Soviets.”); Earth Pledge Found, v. CIA, 988 F.Supp. 623, 628 (S.D.N.Y.1996) (official confirmation of a CIA field station in the Dominican Republic could cause a confrontation with the Dominican Republic or the disruption of foreign relations, despite disclosure of the station’s existence in a Senate Report, because “countries are willing to tolerate the presence of CIA installations in their country only if the United States does not officially acknowledge that such stations exist. Thus, confirmation of the existence of such an installation, even by another branch of the federal government, is different from the CIA itself acknowledging the existence of the base.”) (citation omitted).

. See, e.g., Military Audit, 656 F.2d at 739-40 (“The disclosure of the names of organizations and their employees who entered into ... confidential agreements with the CIA, in connection with the [Glomar Explorer] Project, would almost certainly impact negatively on the ability of the CIA to obtain the assistance of such entities and individuals in similar ventures in the future.... A disclosure that these entities had been engaged with the CIA in an intelligence operation could be harmful to their foreign business and possibly affect the safety of those of their employees who travel abroad.... If the CIA cannot be counted upon to keep the identity of its contractors secret when it has given assurances it will do so, potential contractors may either demand higher fees or refuse to do business with the CIA altogether.... [I]t is one thing for a company to assume the risks of unavoidable or inadvertent leaks and quite another to assume the risk that ... the CIA [will] reveal the link between the company and the Agency.”) (internal quotation marks omitted); Wolf v. CIA, 473 F.3d 370, 376 (D.C.Cir.2007) (official confirmation of a human intelligence source’s cooperation with the CIA could “cause the target government to take retaliatory action against that person, or, if he is no longer alive, against his surviving family and friends,” and would "seriously damage this nation's credibility with all other current intelligence sources and undermine CIA’s ability to attract potential intelligence sources in the future”) (internal quotation marks omitted).

. According to the majority
anything short of [the CIA director personally reading relevant information into the Congressional Record] necessarily preserves some increment of doubt regarding the reliability of the publicly available information. The CIA’s refusal to permit the elimination of that remaining doubt with respect to Ms. Wilson’s pre-2002 service itself protects valuable information, namely, the accuracy of the facts stated in the February 10 Letter and whether there is anything left to hide on the subject. We decline to discount the importance of such "lingering doubts” to maintaining the secrecy of CIA sources and methods relating to unconfirmed periods of Ms. Wilson's Agency service, and to preserving the options of deniability and professed ignorance that remain important niceties of international relations.
*199 Majority Op. at 195 (citations and footnote omitted).

. For instance, according to Mr. Kappes, human intelligence sources who furnish information to the CIA will do so only if they are confident that the CIA will do everything in its power to ensure that their cooperation will remain forever secret. Therefore, official acknowledgment of an individual source's cooperation with the CIA would seriously damage the CIA’s credibility with all of its other sources, and undermine its ability to attract intelligence sources in the future. "The CIA must show its intelligence sources that, even if information that may or may not be true has been disclosed, the CIA will stand by a policy to not acknowledge intelligence information, if any, in order to preserve commitments that the CIA has made to its sources, and to try to preserve those sources’ trust in the CIA." Declaration of Stephen R. Kappes, Deputy Director, Central Intelligence Agency ("Kappes Deck”) ¶ 36.
For example, if an unauthorized disclosure of classified CIA information regarding a human intelligence source were made, that disclosure could jeopardize the source. If the CIA were to officially acknowledge the information, however, that additional step could further jeopardize the source and could deter other clandestine human intelligence sources from cooperating with the CIA. Existing and future human intelligence sources would note that the CIA was willing to confirm publicly a clandestine human intelligence source's involvement with the CIA. These human sources would factor that additional risk into their own decision on whether to provide information to the CIA and could decide that the risks are too great to cooperate with the CIA.
Kappes Deck ¶ 68. The same applies to "foreign liaison relationships,” or cooperative, secret relationships between the CIA and foreign government entities.
[Fjoreign liason sources can be expected to cooperate with the CIA only as long as they remain assured that the CIA will do everything within its power to protect the fact, nature, and details of the clandestine intelligence relationship.... If the CIA breaches that confidence and trust, the foreign liaison service can terminate the intelligence relationship, or retaliate in any number of ways....
Id. ¶ 44-45.
In addition, CIA intelligence-gathering methods are useful only so long as they remain unknown and unsuspected. Once a method is discovered, "its continued successful use will be in serious jeopardy.” Id. ¶ 48. Therefore, "[ajcknowledging cover mechanisms used by the CIA would expose and officially confirm those mechanisms, hindering the effectiveness of the cover for current and future covert employees, as well as current and future intelligence operations.” Id. ¶ 58.
As for foreign retaliation, Mr. Kappes declares that an official disclosure by the CIA could lead a foreign government, either friend or foe, to retaliate against the United States. For example, the CIA maintains covert installations abroad, and "[ojfficial acknowledgment that the CIA maintains an installation in a particular location abroad would likely cause the government of the country in which the installation is located to take countermeasures.” Id. ¶ 59. The same would be true if the CIA were to acknowledge that a foreign country was the target or location of its intelligence operations.
According to Mr. Kappes, this serious damage to national security could result even if the CIA officially acknowledged information that had already been reported in the media. For example, in terms of foreign liaison relationships:
Foreign governments would learn of the official acknowledgment and conclude that the CIA is not trustworthy enough to prevent acknowledgment of sensitive information that is reported in the media. A foreign liason partner could view the acknowledgment as a direct violation of their agreement with the CIA to keep their liaison activities secret. Countries could be expected to respond based on their perception of the CIA’s inability to honor its commitments.
Id. ¶ 70.