Dean E. WOOD, Plaintiff,

v.

Loret M. RUPPE, et al., Defendants.

Civ. A. No. 84–1111.

United States District Court,
District of Columbia.

March 19, 1987.

Henry D. Levine and W. Stephen Smith, Morrison & Foerster, Washington, D.C., for plaintiff.

John D. Bates, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Plaintiff Dean E. Wood brought this action on April 11, 1984, seeking declaratory, injunctive and monetary relief from the five Peace Corps officials who participated in the decision to terminate his services as a Peace Corps volunteer in the Dominican Republic. The sole basis for Wood's termination was that he violated a Peace Corps policy that prohibits volunteers from publicly expressing views on United States or host country political issues while serving in their host countries. Wood alleged that this policy unconstitutionally violates his right to freedom of speech protected by the First Amendment, both on its face and as applied to him and that his termination is consequently unlawful.

In response to Wood's complaint, the defendants moved for summary judgment on Wood's claims against them in their individual capacities, arguing that they were entitled to absolute or, alternatively, qualified immunity. Wood cross-moved for summary judgment on his claims against the defendants in their official capacities. The defendants opposed the latter motion, stating that there were genuine issues of material fact "concern[ing] plaintiff's intentions with respect to his protest activities" that precluded summary judgment. Defendants' Rule 56(f) Affidavit of John D. Bates, August 31, 1984 at ¶ 4.

In a Memorandum Opinion and Order issued September 27, 1985, defendants' motion for summary judgment was granted in that the defendants' were entitled to qualified immunity. At the same time, plaintiff's motion for summary judgment was denied as there were genuine issues of material fact in dispute which precluded summary judgment.

With the Court's approval, the parties agreed to engage in limited discovery and thereafter attempt to stipulate to a set of facts upon which the Court, after receiving legal memoranda from both sides, could decide this case. A set of Stipulated Facts was filed by the parties on February 25, 1986. Trial briefs were received by the Court thereafter. Upon consideration of the Stipulated Facts and the trial briefs, the Court holds that the Peace Corps' termination of Wood was not unconstitutional.

## BACKGROUND

The facts of this case are set out in the Stipulated Facts filed by the parties. While the Court will not repeat those twenty-four pages of fact in full here, a brief summary is in order since the specific factual context in which the claim arose is particularly determinative in cases such as this. Wood joined the Peace Corps in August 1982 and was assigned to work in the Dominican Republic for a term of two years. During his tenure as a volunteer he earned praise as one of the "quieter, more serious volunteers," who was "highly qualified for his work," and had "an excellent record in the country." [*] The events that gave rise to Wood's termination began with the invasion of Grenada by United States Armed Forces in the early morning of October 25, 1983. Soon thereafter, the Dominican government assigned additional police to guard the United States Embassy.

Wood first heard about the U.S. intervention in Grenada from a Dominican acquaintance on the evening of October 25, 1983. As he was on his way to visit a friend in the hospital and because he found the report difficult to believe he did not, at that time, consider any protest activity. When Wood arrived at work the next morning, he saw a newspaper account of the Grenada intervention. He then decided to protest that intervention at the U.S. Embassy in Santo Domingo. Wood was not aware of the fact that violent demonstrations had taken place in Santo Domingo on the evening of October 25.

Wood made two placards which read, on opposite sides, in Spanish, "Fuera de Afghanistan—Fuera de Grenada" ("Out of

[*] All quotations are from the Stipulated Facts filed in this case.

Afghanistan—Out of Grenada"), Fin de Imperialismo Americano ("End American Imperialism"), and "Fuera Los Invasore Americanos" ("Get out American Invaders"), "Solo Reagan No Quiere Paz" ("Only Reagan Doesn't Want Peace"), respectively. Wood obtained the materials for his placards from the Coolfalcondo cooperative, an organization which operated the Bonarte pottery project for which Wood worked. The cooperative is owned and operated by Dominican citizens and has no affiliation with the Peace Corps or the United States government.

Wood told his Dominican counterpart at the pottery project that he was going to Santo Domingo to protest the U.S. intervention in Grenada. Otherwise, he did not discuss his protest with anyone. Wood was wearing a tee-shirt which said "Cuerpo de Paz Republica Dominicana—1983" ("Peace Corps Dominican Republic—1983"). He decided to wear the tee-shirt before he went to work and saw the newspaper article describing the U.S. intervention. When he decided to go to Santo Domingo to protest, he did not change his clothes. According to a November 3, 1983, "Memorandum to the File" written by Noreen O'Meara, the Peace Country Desk Officer for the Dominican Republic, Wood stated at a meeting with the Dominican Republic Desk Unit of the Peace Corps "that he had not worn his Peace Corps tee-shirt intentionally (it was what he had worn to work that morning)."

At approximately 10:15 a.m. on October 26, a delegation of about twenty-five members of the Dominican Leftist Front arrived at the U.S. Embassy to deliver a letter of protest against U.S. actions in Grenada to the Ambassador. An Embassy official accepted their letter outside the gates and they departed. The government of the Dominican Republic also officially protested the U.S. intervention in Grenada.

After traveling more than an hour by bus, Wood arrived at the U.S. Embassy in Santo Domingo between 10:00 and 10:20 a.m. on October 26, and began carrying his signs in front of the Embassy on Embassy property. When he arrived, Wood did not see any other protesters. Almost immediately, Embassy guards told him he would have to leave. Shortly, thereafter, a policeman who was standing across the street from the Embassy approached Wood and told him that all legal protests had to take place across the street. Wood immediately complied and moved to the other side of the street.

Once Wood was across the street, he was approached by reporters. In response to a reporter's question, Wood stated that he was a Peace Corps volunteer, but that he was expressing his personal viewpoint about the U.S. intervention in Grenada. At approximately 10:50 a.m., a Dominican policeman told Wood to move to the corner of the next block. When Wood attempted to comply, he was taken in for questioning by the Dominican police.

Contemporaneous with Wood's demonstration, there were several student protests against the U.S. intervention in Grenada. One of these began approximately one mile from the U.S. Embassy at about the time of Wood's protest and moved toward the Embassy. The protesters, numbering between 200 and 300, passed the American Consulate but were prevented from reaching the U.S. Embassy by Dominican anti-riot police using tear gas. One Dominican newspaper reported that twenty-six students were injured in the protest. One protester was arrested and placed in the same car in which Wood was placed.

Wood was taken to local police headquarters where he was held overnight but not interrogated by the police. Local counsel was retained for Wood by the Peace Corps and, together with Peace Corps and Embassy officials, worked with local authorities for Wood's prompt release. Mr. Duran, the Country Director for the Peace Corps in the Dominican Republic, was informed by the Chief of Police, and later told U.S. Consul General Dudley Sipprelle, that Wood would be released immediately if the Peace Corps would return him to the United States forthwith.

At the time of his protest, neither the reporters, the Dominican police, nor Embassy officials told Wood anything about

other protests in the Dominican Republic in response to the U.S. intervention in Grenada. Wood did not know of any of the student protests. Aside from his protest at the U.S. Embassy, Wood did not make any attempt or request to communicate his views.

Late on October 26, a telephone call took place between Duran, Mr. del Rio, the Director of Inter-American Operations for the Peace Corps, and Ms. O'Meara, regarding the Wood incident. During that discussion, it was decided that since it seemed clear that Wood was speaking his personal opinion and was not connecting his protest with either the Peace Corps or the U.S. Government he would be given the opportunity to remain in the country. It was noted, however, that should the Ambassador recommend that Wood be asked to leave the country, the Peace Corps would have grounds to dismiss Wood based on his violation of Peace Corps policy.

In the early morning of October 27, a second telephone call took place between Duran, del Rio and O'Meara. They discussed a meeting which had taken place the previous evening between Ambassador Anderson and Consul General Siprelle, in which it was agreed that Peace Corps volunteers have a right to protest and that to try to stifle them is bad policy which might create larger incidents among the other volunteers. The Embassy's concern with avoiding the appearance of making deals with the Dominican police was also mentioned. It was agreed that the Peace Corps should follow the course of action desired by the Embassy. The Peace Corps and the Embassy would attempt to secure Wood's release through normal channels and bring the situation to as speedy a resolution as possible.

That same day, newspaper accounts of Wood's protest stated that Wood "identified himself as a member of the Peace Corps of the United States working in the country," and that he "staged a solitary protest in front of the United States Embassy." His picture, wearing a Peace Corps tee-shirt, appeared on the front page of the leading Dominican newspaper, as well as on local television newscasts. One newspaper reported that, according to its sources, "national authorities were afraid that further statements by U.S. youths would inflame or elevate the strength of the protests from students, workers and leftist organizations that are against the military occupation of Grenada by a multinational force headed by the United States," and that "the reason the police wanted the young American deported was 'for interfering in the internal affairs of the country.'" The story said that "the central office of the Peace Corps in the country and the North American Department of State communicated with the Peace Corps in the Dominican Republic, and they repeated that the young American should 'close his mouth'.... The young man, simply dressed, carried a poster on' which he expressed his protest as much for the invasion of Grenada by the United States, as for the invasion of Afghanistan by troops of the Soviet Union. Keep in mind that this is the first time that a North American has staged a protest of this nature on Dominican territory based on an act of the United States. When detained, the young man repeated to police that 'he didn't want to confront anyone.' He added his intention 'was not to create problems'."

Wood was released on October 27, 1983, without charges being brought against him by the local police. One Dominican newspaper quoted a police spokesman as saying that Mr. Wood was released because "we found that he had not done anything wrong in his actions."

Wood met with Duran, on the afternoon of October 27, to discuss the incident. Duran told Wood that he could not at that time reach a conclusion as to whether Wood's expression violated Peace Corps policy. In his October 28, 1983, "Report of Peace Corps Service" concerning Wood, Duran wrote: "We both agreed that he had publicly expressed certain views but we were both concerned about the definition of a violation of P[eace] C[orps] statutes. As to exactly what is defined as political expression and what may be said and not said publicly against one's own government."

A third telephone conversation between Duran, del Rio, and O'Meara took place on the morning of October 28. The Embassy had recommended that Wood be permitted to remain in the country so as not to give the wrong impression to the Chief of Police. Notwithstanding that advice, due to Wood's violation of Peace Corp policy which triggered a series of events which could have had a deleterious effect on the Peace Corps' relationship with the government of the Dominican Republic, and at worst, could have created a negative international image of the Peace Corps, it was decided that the best course of action would be to administratively separate Wood. It was arranged for him to leave the country after the departure of a then present NBC film crew.

Wood returned to Bonao on October 28, 1983. He was informed in a telephone call from Duran that he was being terminated from the Peace Corps for violating the Peace Corps political expression policy and that he was to return to the United States the next day.

Duran effected Wood's termination through his October 28 "Report of Peace Corps Service." The rationale for Wood's termination as put forth in that document was that "[d]ue to political involvement by participating in a demonstration in front of U.S. Embassy, which lead [sic] to statements in the public media, i.e., TV & newspaper. This behavior lead [sic] to arrest and detention by D.R. secret police," and "[r]ecommendation by Acting Director Ed Curran, & P[eace] C[orps] General Council [sic] Al Cook, & I.A. Regional Director Luis del Rio, that action of vol[unteer] violated standing P.C. regulation against public involvement in political activity, which might compromise P.C. D[ominican] R[epublic]." Duran also wrote "[d]ue to his idealism and work ethic, we would consider him for another assignment."

On October 29, 1983, Mr. Wood returned to the United States. He was informed that if he wished to appeal his early termination, he would have to submit a written statement on November 7, 1983, which he did.

Thirty-nine Peace Corps volunteers in the Dominican Republic sent a letter to the General Counsel of the Peace Corps in Washington, D.C. on November 29, 1983, asking that Wood be reinstated. The letter stated that the volunteers believed that their role as agents of peace had been made more credible to the Dominican Republic as a result of Wood's actions.

Wood was informed by letter on February 24, 1984, that his appeal had been denied and that he would not be considered for future Peace Corps service. An April 6, 1984, letter explaining the reasons for the denial stated: (a) by violating the Peace Corps policy relating to political expression, Wood's "behavior could be seen by host country citizens as support for participants in the disorders which occurred," even though "there does not seem to be any direct connection between [Wood's] demonstration and other events occurring at the same time"; (b) statements in Dominican newspapers "reveal[ed] official concern about the effects of [Wood's] public demonstration" and "[t]he existence of such sentiment jeopardizes [Wood's] personal effectiveness as a volunteer, the Peace Corps (as an arm of United States foreign policy) with the government of the Dominican Republic"; and (c) "where, as in this case, the means chosen to exercise [speech] rights potentially involves a volunteer in matters of controversy within the host country, and thereby threatens the effectiveness of the Peace Corps program within the country, the volunteer's individual wishes have to give way to the larger national purpose of the Peace Corps."

## ANALYSIS

The Peace Corps policy Wood violated states in relevant part:

A Volunteer may express views on issues relating to the United States in the American press. He or she may petition United States government officials as could have been done if the Volunteer had remained in the United States....

*It is Peace Corps policy that Volunteer expression of opinion on political issues, whether relating to the Unit-*

*ed States or to the host country, may be made only in a private manner while serving within host countries. . . .*

One must avoid becoming involved in the political affairs of the host country. . . . The Peace Corps' commitment is not to the political forces of a nation but to its people. . . .

A violation of these policies may result in termination. If an applicant, trainee or Volunteer should have any question about the policies, write to the Peace Corps Office of the General Counsel, . . . bring them up with staff during training, or discuss the matter with the Country Director. . . . (Emphasis added).

Political expression in the host country is discussed in a Peace Corps Manual prepared for internal use by Peace Corps officials. That Manual is not provided as a matter of course to volunteers. Political involvement which, in the opinion of the Country Director, impairs the effectiveness of the Peace Corps or the individual volunteer may be grounds for separation. Primary responsibility for administering the Peace Corps' political expression policy lies with the Country Directors.

Wood challenges the Peace Corps' political expression policy on two grounds. First, Wood asserts that the policy as applied is an unconstitutional denial of his right to free speech protected by the First Amendment. Second, Wood claims that the policy is facially overbroad, thus unconstitutional. Defendants submit that the policy, both as written and as applied to Wood, survives these constitutional challenges.

To evaluate restrictions on the speech of government employees, the Supreme Court has held that the judiciary's task "is to seek 'a balance between the interest of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs.' " *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983) (quoting *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968)).

Furthermore, any restrictions must "protect a substantial government interest unrelated to the supression of free speech. *McGehee v. Casey,* 718 F.2d 1137, 1142 (D.C.Cir.1983) and cases cited therein. Finally, the restrictions must *also* be narrowly drawn to "restrict speech no more than is necessary to protect the substantial government interest." *Id.*

The Supreme Court has made it clear in both *Pickering* and *Connick* that " '[b]ecause of the enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish ground for dismissal . . .' " the Court did " 'not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged.' " *Connick,* 461 U.S. at 154, 103 S.Ct. at 1694 (quoting *Pickering,* 391 U.S. at 569, 88 S.Ct. at 1735). "[T]he State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests." *Id.,* 461 U.S. at 150, 103 S.Ct. at 1692.

In order for this Court to perform this particularized balancing, full consideration of the government's interest is required. *Connick,* at 150, 103 S.Ct. at 1692. In this case, the Court finds that interest to be a compelling one. The Peace Corps has "held steadfastly to an apolitical course. . . ." As stated in the Peace Corps Handbook, "[t]his policy is the keystone of the . . . larger long term commitment to serve the peoples of host countries and to serve them effectively. Because the Peace Corps and the individual Volunteers are seen and respected as being outside the political arena, they have been able to serve people whose governments encompass almost the entire spectrum of ideologies and political alignments." *Id.* The Peace Corps believes that the achievement of these goals "would be undermined if the agency were perceived as a political instrument of U.S. foreign policy." *Id.* at 7, 13.

The basic concern of the Peace Corps political expression policy is that "[a]ny public political statements or actions by Volunteers overseas could create doubts and misunderstandings as to the Peace Corps' basic purposes within the host country." *Id.* at 7. Those purposes are to "promot[e] economic and social development, as well as positive attitudes toward Americans and their democratic institutions" and to "provid[e] a marked contrast and counter-weight to Soviet efforts at diplomacy." *Id.* at 12.

On the other hand, the interest of the speaker in this case is also great. "[T]he [Supreme] Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick,* at 145, 103 S.Ct. at 1689 (citations omitted). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Id.* The Court emphasized that *Pickering* and its progeny "followed from this understanding of the First Amendment." *Id.*

There is no dispute that Wood's speech was on a matter of public concern and is thus entitled to the greatest protection from suppression. That protection does not diminish because of Wood's presence in a foreign country. *See Reid v. Covert,* 354 U.S. 1, 5–14, 77 S.Ct. 1222, 1224–29, 1 L.Ed.2d 1148 (1957); *Berlin v. Democratic Club v. Rumsfeld,* 410 F.Supp. 144, 160–61 (D.D.C.1976). For U.S. citizens residing abroad, particularly those with limited access to the American press, their fellow citizens, and U.S. officials, such expression of opinion may represent one of the few means available to learn about and discuss the public issues of the day.

Under the particular circumstances of this case, however, this Court finds that the Peace Corps' interest in remaining an apolitical entity outweighs Wood's interest in publicly expressing a political view at the time, in the manner, and under the circumstances he chose. This is not to say that all public expression by Peace Corps volunteers on political topics is justifiably sup-

pressed by the Peace Corps. *See, Murray v. Blatchford,* 307 F.Supp. 1038 (D.R.I. 1969); *Murray v. Vaughn,* 300 F.Supp. 688 (D.R.I.1969) (finding supression of Peace Corps volunteer's speech unconstitutional). That is a determination which depends heavily on the facts of each individual case.

In this case, there are several factors on which this Court relies in reaching its decision. Wood both wore a Peace Corps tee-shirt when he made his statements and identified himself as a Peace Corps volunteer to the media and consequently to the general public. While Wood disclaimed his intent to speak on behalf of the Peace Corps or the U.S. Government, he was nonetheless portrayed by the local media as a Peace Corps volunteer. It is not Wood's intent to speak only as a private citizen which is controlling, but the perception among the local people that Wood was associated with the Peace Corps and the likelihood that, intentionally or not, his message would also be associated with the Peace Corps and would hinder the Peace Corps' apolitical image and policy of political non-involvement.

The evidence shows that when Duran, del Rio, and O'Meara first discussed the appropriate action to take in response to Wood's protest, during their phone call of October 26, they agreed to allow Wood to remain in the Dominican Republic. At that time the newspapers which pictured Wood on the front page in his Peace Corps tee-shirt, and the similar television reports about Wood's activities had not yet been published. By October 28, when Duran, del Rio, and O'Meara again discussed the situation, their decision had changed. It can be inferred that the intervening media publicity concerning Wood's protest and portraying Wood as a Peace Corps volunteer was influential in their change in position.

Peace Corps policy clearly allows volunteers to petition U.S. officials as they could if they had remained in the United States. Certainly, the U.S. Embassy is an appropriate place for an American citizen to petition U.S. officials when living in a foreign country. In this case, the facts

**410**

show that just prior to the time of Wood's protest a delegation of about twenty-five members of the Dominican Leftist Front went to the U.S. Embassy and delivered a letter of protest against U.S. actions in Grenada to the Ambassador. Their letter was accepted by an Embassy official and the group departed without further incident. Wood's actions, however, went beyond merely petitioning his government's officials and it is those actions which are the basis for the Peace Corps' subsequent dismissal of Wood.

Wood chose to remain at or near the Embassy to communicate his message. He carried signs, written in Spanish, which others in the area could read as well as the officials within the Embassy. His actions took place contemporaneously with a large student demonstration which was approaching the Embassy. The use of tear-gas by anti-riot police was necessary to prevent the crowd of several hundred people from reaching it. It was reported that twenty-six people were injured in the fray. Similar riots had occurred the previous evening and violence had erupted at that time as well. Wood was ultimately arrested and placed in a police car with one of the protesters.

It is irrelevant that Wood did not know of, or intend to be a part of this larger protest. Wood's activities took place closely enough in both time and place so that Wood was, in fact, ultimately involved with the others, in that he was arrested by the local police together with one of the other demonstrators. In addition, while the local press reported that Wood "staged a solitary protest", and "was the first North American to stage a protest of this nature on Dominican territory", they also reported that "the central office of the Peace Corps in the country and the North American Department of State ... repeated that the young American should 'close his mouth'" and that "national authorities were afraid that further statements by U.S. youths would inflame or elevate the strength of the protests...." One story reported that

local police wanted to deport Wood "for interfering in the internal affairs of the country."

The Peace Corps and the U.S. Embassy were forced to become further involved in a volatile political event in order to assist in Wood's release from police headquarters. There is also evidence that the Embassy had to take into account certain political implications that would result with regard to the local Chief of Police and his apparent ability to influence U.S. officials in deciding whether or not to deport Wood.

In this case the Peace Corps' concern is with maintaining a neutral image of its organization. In spite of Wood's intentions to speak on his own behalf and his lack of knowledge of, or involvement with, other demonstrations, it is apparent that, as a result of Wood's actions, the Peace Corps was directly involved in a local political event. That sort of involvement is precisely what the Peace Corps must avoid if its reputation for independence is to be maintained and its stated goals achieved.

To allow a volunteer to even unintentionally entangle the Peace Corps in a political disruption, in which both the United States and the Dominican Republic have an interest at stake, is to threaten the very ability of the Peace Corps to continue to function and to exist.** This is a case about public perceptions, appearances, and images and it is vital to the interest of the Peace Corps that its neutral image not be tarnished as the evidence demonstrates it has been here.

Having found that the action taken against Wood by the Peace Corps was justified in light of the compelling interests of the Peace Corps which were at stake in this case, and evidence of actual harm to those interests, this Court must assure that the Government's restriction "must be narrowly drawn to 'restrict speech no more than is necessary to protect the substantial government interest.'" *McGehee* at 1143, citing *Brown v. Glines*, 444 U.S. 348, 355, 100 S.Ct. 594, 600, 62 L.Ed.2d 540 (1980).

Peace Corps policy does not prohibit private speech by its volunteers on matters of

** There is evidence in the record that in the past the Dominican Republic had been the subject of

U.S. intervention, similar to that which occurred in Grenada.

political expression, although volunteers are admonished to portray their opinions as their own, and not as representative of the Peace Corps or the U.S. Government's position. Nor does it prohibit public speech on political events made in the American press by a volunteer. These sorts of statements do not significantly interfere with the interest of the Peace Corps in staying out of the political sphere. It is only in situations such as this one, where there has been a direct threat to the interest of the Peace Corps, that speech is prohibited; thus, the policy is narrowly tailored to restrict speech no more than is necessary to protect a compelling government interest.

Wood has contended that the Peace Corps policy as written is unconstitutionally overbroad. While this Court finds that Wood has standing to make this challenge, it is one that this Court declines to reach on these facts and at this time. Even though impermissibly broadly worded laws "may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statue on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe." *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973).

The Supreme Court has emphatically observed that "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984). Moreover, a statute should not be deemed facially invalid unless it is not subject to a narrowing construction by the courts. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975); *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

It is not apparent that Wood has made the necessary showing that the First Amendment rights of third parties not before the Court will be chilled in that those parties will refrain from constitutionally protected speech or expression due to the existence of the Peace Corps' political expression policy. Even assuming, arguendo, that he has, the Peace Corps policy is certainly capable of being construed in such a way as to render it constitutional. It is only in a situation such as the one presently before the Court, where there is evidence of a direct threat to the interest of the Peace Corps due to the expression of the volunteer on a matter related to the host country politics, that enforcement of the policy will be upheld. There is no evidence that the policy has ever been applied in any other context or will be.

In fact, the Peace Corps policy expressly allows a volunteer to express views on issues relating to the United States in the American press. The examples of expression suggested by plaintiff in their briefs, such statements opposing student loan cuts or welfare program changes, would be protected speech under this narrow construction of the policy.

The Peace Corps policy also expressly allows a volunteer to petition U.S. officials. Again, if this was done under circumstances, unlike those here, which did not result in direct harm to the Peace Corps' interests in remaining uninvolved in political events, it too would be protected speech. Although the portion of the Peace Corps' political expression policy challenged by Wood is very broadly worded, when read in the context of the entire Peace Corps policy contained in the Peace Corps Handbook, and especially in view of Peace Corps prescreening procedures for consulting with the Country Director on the applicability of these policies, it is unnecessary for this Court to strike down the challenged Peace Corps political expression policy on overbreadth grounds at this time.

## ORDER AND JUDGMENT

Upon consideration of the Stipulated Facts, the trial memoranda, and the Memorandum Opinion constituting the Court's

**412**

findings of fact and conclusions of law, it is this 19th day of March, 1987,

ORDERED that judgment be, and hereby is, entered for defendants.