3 F.3d 1555
 303 U.S.App.D.C. 271
 NATIONAL TREASURY EMPLOYEES UNION, et al., Appellants,
v.
UNITED STATES of America, et al. (Two Cases).
Peter G. CRANE, et al., Appellants,
v.
UNITED STATES of America, et al.
NATIONAL TREASURY EMPLOYEES UNION, et al.
v.
UNITED STATES of America, et al., Appellants.
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,
v.
UNITED STATES of America, et al., Appellants.
Peter G. CRANE, et al.,
v.
UNITED STATES of America, et al., Appellants.
 Nos. 92-5085, 92-5139, 92-5170, 92-5235, 92-5236 and 92-5237.
 United States Court of Appeals,
District of Columbia Circuit.
 Sept. 21, 1993.
 
 On Suggestion for Rehearing En Banc.
 Before: MIKVA, Chief Judge, WALD, EDWARDS, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, HENDERSON, and RANDOLPH, Circuit Judges.
 Prior report: C.A.D.C., 990 F.2d 1271.[303 U.S.App.D.C. 272] ORDER
 PER CURIAM.
 
 
 1
 The Suggestion for Rehearing En Banc of the United States and the response thereto have been circulated to the full Court. The taking of a vote was requested. Thereafter, a majority of the judges of the Court in regular active service did not vote in favor of the suggestion. Upon consideration of the foregoing, it is
 
 
 2
 ORDERED, by the Court en banc, that the suggestion is denied.
 
 
 3
 Circuit Judge SENTELLE would grant the suggestion for rehearing en banc.
 
 
 4
 Separate opinion filed by Circuit Judge STEPHEN F. WILLIAMS, concurring in the denial of rehearing en banc.
 
 
 5
 Separate opinion filed by Circuit Judge SILBERMAN, dissenting from the denial of rehearing en banc.
 
 
 6
 STEPHEN F. WILLIAMS, Circuit Judge, concurring in denial of rehearing and rehearing en banc:
 
 
 7
 Judge Silberman raises the tempting proposition, ignored by the parties to this litigation, that by moving the closing end of a parenthesis in the definition of "honorarium" we might transform the statute into one of virtually undoubted constitutionality. I believe the panel correctly resisted this temptation.
 
 
 8
 As enacted, the amended definition of honorarium reads as follows:
 
 
 9
 The term "honorarium" means a payment of money or anything of value for an appearance, speech or article (including a series of appearances, speeches, or articles if the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government) by a Member, officer or employee, excluding any actual and necessary travel expenses incurred by such individual....
 
 
 10
 5 U.S.C.App. 7 Sec. 505(3).
 
 
 11
 Under Judge Silberman's microsurgery, the end of the parenthesis is moved up, so that the definition--and thus the ban--applies only to appearances, speeches and articles related to the employee's duties or for which the payment relates to his or her status with the government. Thus:
 
 
 12
 The term "honorarium" means a payment of money or anything of value for an appearance, speech or article (including a series of appearances, speeches, or articles) if the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government by a Member, officer or employee, excluding any actual and necessary travel expenses incurred by such individual....
 
 
 13
 Before addressing the substance of this revision, we should consider its syntax, which bears no resemblance to English. The prepositional phrase "by a Member, officer or employee" appears superficially to be a part of the subject-or-status limitation; once the reader recognizes that it is not, he must set off on a wholly unguided search for the terms the phrase really modifies ("an appearance, speech or article").[1]
 
 
 14
 Judge Silberman's justification for his adjustment rests on some legislative history and on the view that the statute is illogical as written. The legislative history--like so much legislative history--is highly ambiguous, and the statute as written is by no means so irrational as to warrant our rewriting it.
 
 
 15
 The only directly relevant item of legislative history is the following observation of the conference committee:
 
 
 16
 Subsection (b) amends the definition of 'honorarium' to include payment for a 'series of appearances, speeches or articles,' if the subject matter is related to the individual's [303 U.S.App.D.C. 273] duties or payment is made because of the individual's status with the Government, rather than only payment for a single event.
 
 
 17
 H.R.Conf.Rep. No. 176, 102d Cong., 1st Sess. 12 (1991); see also Silberman, J., infra at 1561 (emphasizing the word "include").
 
 
 18
 The committee's observation is quite consistent with the wording used by Congress in the statute. As enacted, the amended statutory definition does "include" a series of appearances, speeches or articles when the conditions specified in the parenthesis, and in the committee report, are present. The legislative history provides no license to start shuffling parentheses around.
 
 
 19
 The same is true if we focus on the way in which the 1991 amendment changed the pre-existing law. The unamended law obviously encompassed receipt of payment for a series of speeches. Before the amendment it would have been an odd defense, and surely a losing one, for an employee to say, "Not guilty--I took payment for three speeches, not one." As the implementing regulations promulgated by the Office of Government Ethics ("OGE") confirm, people understood the unamended statute to treat a series exactly like a single event. "An economist employed by the Department of the Treasury," went one of the OGE's examples, "has entered into an agreement with a speakers bureau to deliver ten after-dinner speeches to be arranged by the speakers bureau over a 6 month period. The employee may not receive the contract fee of $10,000." 56 Fed.Reg. 1721, 1725 (1991).[2] Since the original act treated a series of speeches the same as a single speech, the only plausible reason for adding a reference to a series of speeches must have been to treat them differently.
 
 
 20
 Citing a Senate committee report saying that under the pre-amendment ban a federal employee "can teach a full semester course on a particular subject, but cannot be paid for a single lecture on the same subject", S.Rep. No. 29, 102d Cong., 1st Sess. 5 (1991), Judge Silberman argues that Congress did not think that the unamended statute covered payments for a series of events. See Silberman, J., infra at 1563-64. But the exception for teaching arose not from any distinction between a series and a single event but from the statute itself. The Ethics Reform Act of 1989 barred Members of Congress, officers of the federal government, and high-level federal employees other than career civil servants from receiving compensation for teaching unless they secured "the prior notification and approval" of the appropriate entity. Pub.L. No. 101-194, 103 Stat. 1761 (1989); see 5 U.S.C.App. 7 Sec. 502(a)(5) (1992). The plain implication, as the commentary to regulations issued by the Judicial Conference of the United States explains, was that "the prohibition on receipt of honoraria does not foreclose teaching for compensation." 2 Administrative Office of the United States Courts, Guide to Judiciary Policies and Procedures V-41 (1991). Thus, OGE's implementing regulations excluded from the honorarium ban "[c]ompensation for teaching a course involving multiple presentations by the employee offered as part of the regularly established curriculum of an institution of higher education." See 56 Fed.Reg. 1725 (1991).
 
 
 21
 Moreover, the Senate committee was not concerned with some fantastic loophole for multiple speeches but with the ban's unduly harsh treatment of activities other than teaching. The committee's bill accordingly sought to introduce a broad subject-or-status limitation for "an appearance, a speech, or an article", language the committee used to cover both isolated events and elements of a series. See S.Rep. 102-29 at 17. But Congress never enacted this broad limitation. Instead, the 1991 amendment left in place the flat ban on honoraria for isolated events, while relaxing it for a series. In sum, Congress never supposed that the ban exempted [303 U.S.App.D.C. 274] multiple speeches (other than those encompassed in the special treatment of teaching), and the effort to impose a general subject-or-status limitation fizzled.
 
 
 22
 As to the sense of the amended statute: Congress may well have thought that the added effort required for a government official to make a series of speeches, etc. (not to mention the added effort of his listeners) provided an inherent limitation on this avenue of corruption, justifying a more relaxed approach. To be sure, this limitation is not perfect. It may take no more effort to write a series of three 10,000-word articles on a single subject than to write one 30,000-word article. What is more, as the illicit effect of the payment will turn in part on its relation to the worker's effort, payors could achieve their corrupt purposes simply by boosting the payment.
 
 
 23
 Still, there is another reason why Congress might have treated honoraria for isolated events or articles more strictly than honoraria for a series. If a Member of Congress or a government employee is making repeated paid appearances before a particular group, his connection to the group is likely to be more open and more visible to the public (or the public's watchdogs) than if he had simply accepted a one-time payment for a single appearance. Congress might reasonably have concluded that corruption is less likely under such circumstances.
 
 
 24
 * * * * * *
 
 
 25
 Judge Silberman goes on to support en banc treatment on the premise that we might wisely excise from circuit law the application of a "narrow tailoring" test to restrictions on the speech of government employees. See Silberman, J., infra at 1565-66, citing McGehee v. Casey, 718 F.2d 1137, 1143 (D.C.Cir.1983) (applying narrow tailoring test). Before the Supreme Court in Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), repudiated the idea that the "narrow tailoring" concept encompassed a "least restrictive means" test in cases not subject to strict scrutiny, id. at 796-802 & n. 6, 109 S.Ct. at 2756-60 & n. 6, this proposal would have raised a most interesting issue. Post-Ward, however, it is apparent that "narrow tailoring" is itself a balancing test, under which courts inquire whether the disputed ban "burden[s] substantially more speech than is necessary to further the government's legitimate interests." Id. at 799, 109 S.Ct. at 2758; see also Henderson v. Lujan, 964 F.2d 1179, 1184 (D.C.Cir.1992). Thus "narrow tailoring" seems to add little more than metaphor. See id.[3]
 
 
 26
 Judge Silberman apparently disagrees. Courts review restrictions on the speech of government employees, he observes, by balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Silberman, J., infra at 1565, quoting Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Judge Silberman acknowledges that overbreadth can cause a restriction to fail this generalized balancing test, for "[w]hen the government burdens substantially more speech than 'required' by its asserted interest, then its asserted interest might not outweigh that greater burden." Id. at 1565-66. But he indicates that substantial overbreadth is not always fatal; as long as the legitimate interests served by restricting the speech of government employees outweigh the burdens caused by the restriction, the restriction passes constitutional muster even if the restriction's scope is substantially broader than the goal supports.
 
 
 27
 But if the burdens caused by a restriction on speech are substantially greater than is appropriate to achieve the government's legitimate end, taking all line-drawing problems into account and according the political branches' judgment due weight, it is hard to [303 U.S.App.D.C. 275] see what interest justifies the excess burdens. They appear wholly unsupported, for by hypothesis the government could amply achieve its purposes by enacting a narrower restriction. As a practical matter, then, the generalizedPickering balance and the "narrow tailoring" test seem unlikely to yield different results.
 
 
 28
 Assuming that a "narrow tailoring" test does add to what is implicit in the concept of balancing, moreover, the signs from the Supreme Court appear quite consistent with applying such a test to restrictions on the speech of government employees. In United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Court upheld the Hatch Act only after considering whether certain provisions rendered it "fatally overbroad". Id. at 580, 93 S.Ct. at 2898. In Pickering the Court reserved judgment on "the extent to which teachers can be required by narrowly drawn grievance procedures to submit complaints about the operation of the schools to their superiors for action thereon prior to bringing the complaints before the public." 391 U.S. at 572 n. 4, 88 S.Ct. at 1737 n. 4 (emphasis added). And in Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), in upholding Air Force regulations that required members of the service to get the appropriate commander's approval before soliciting signatures for petitions on Air Force bases, the Court stated its grounds in terms that almost exactly pre-figured Ward's formulation of "narrow tailoring", saying that "the Air Force regulations restrict speech no more than is reasonably necessary to protect the substantial governmental interest." Id. at 355, 100 S.Ct. at 600.
 
 
 29
 In any event, the "narrow tailoring" test applies to government restrictions on speech on a government-owned "public forum", and I question whether the government's interest as employer is so distinct from its interest as proprietor as to justify applying a markedly different test (assuming that were to flow from Judge Silberman's proposal). At any rate, there seems no reason to rush into an en banc on questions that no party has raised.
 
 
 30
 SILBERMAN, Circuit Judge, dissenting from the denial of rehearing en banc:
 
 
 31
 The panel opinion declared an act of Congress governing the acceptance of speaking fees (honorarium) on the part of officers and employees of all three branches of government unconstitutional on its face as it would apply to the entire executive branch--not the legislative or judicial branch. The intrinsic importance of such a decision is hardly to be questioned. But I think the case is particularly deserving of rehearing, because I doubt that it is necessary to decide the constitutional question. The district court's opinion, which the panel affirmed, paradoxically, declared unconstitutional the unamended version of a statute that had been amended before the court's decision (and the court considered outdated executive branch regulations implementing the statute). Although the panel noted the statute's amendment, it did not explicitly consider the amendment's significance and the possibilities it offers in avoiding the constitutional question. Even if it were necessary to decide the statute's constitutionality, I am inclined to think we should employ a quite different constitutional analysis and supply a different remedy. The panel, overlooking what seems to me to be the most obvious remedial order, one that would strike down only the arguably offensive part of the statute, instead unjustifiably views executive branch employees more favorably than congressional and judicial employees and inexplicably--presumably because inexplicable--struck down a portion of the statute which is unquestionably constitutional.
 
 A.
 
 32
 Congress, in November, 1989, seeking to place new and more stringent restrictions on the receipt of "outside" income by governmental employees than previous laws and regulations had provided, enacted a series of amendments to the Ethics in Government Act of 1978. Although the debates surrounding the adoption of perhaps the most controversial aspect of this legislation--a flat ban on the receipt of "honoraria"--focused largely, if not exclusively, on the need for such a [303 U.S.App.D.C. 276] ban to halt the receipt of honoraria by members of Congress, the act as passed applied that unqualified ban to virtually all government employees. These amendments, collectively entitled "The Ethics Reform Act of 1989," ("Reform Act") Pub.L. No. 101-194, became effective on January 1, 1991, and the Office of Government Ethics promulgated implementing regulations on January 17. See 56 Fed.Reg. at 1721.
 
 
 33
 As originally enacted, and as currently written, the Reform Act provides: "An individual may not receive any honorarium while that individual is a Member, officer or employee." 5 U.S.C.App. 7 Sec. 501(b). As originally enacted, but not as currently written, the act defined the term "honorarium" as "a payment of money or anything of value for an appearance, speech or article by a Member [of the House of Representatives], officer or employee, excluding any actual and necessary travel expenses...." See Pub.L. No. 101-194, Title VI, Sec. 601(a), 103 Stat. 1760 (1989). Thus, the original Reform Act created a flat ban on the receipt of honoraria by virtually all governmental employees, but did not apply that ban to senators.[1]
 
 
 34
 Within a very short time after the enactment of the Reform Act, a strong sentiment seems to have emerged in Congress that the flat ban applicable to all governmental employees was unwarranted (and, indeed, probably unintended). At the end of 1990--even before the effective date of the Reform Act--the Senate unanimously passed a bill that would have replaced the flat ban on the receipt of honoraria with a limited prohibition against the receipt of honoraria by government employees where the subject matter of the writings directly related to the employees' official duties or where the payment was related to the officers' status. See S.REP. NO. 29, 102d Cong., 1st Sess. 2 (1991). That bill drew no distinction between one-time speeches and a "series" of speeches. Id. at 2, 16-17. The House failed to act on the bill before it recessed, and it did not become law. Id. at 2.
 
 
 35
 On January 22, 1991, only days after Congress had reconvened, Senators Glenn and Roth again introduced a bill, S. 242, that "was the same in substance" as the bill introduced the previous year.[2] S.REP. at 2. S. 242 had no fewer than 30 co-sponsors. See id. It was referred to the Committee on Governmental Affairs, which reported the bill favorably to the Senate without dissent. See id. at 2-3. In fact, there is no indication that any senator ever doubted the desirability of amending the Ethics Reform Act so as to modify the flat ban on the receipt of honoraria by governmental employees. As the Senate Committee noted, "Congressional debate concerning the honoraria [when the original act was passed] focused on the importance of prohibiting honoraria for high-ranking Government officials, especially members of Congress," and "[l]ittle attention was paid" to the question of lower-level governmental employees. Id. at 3-4. Thus, the "impact of the honoraria ban on rank-and-file employees [only] became apparent late [in 1990], prompting the legislative effort to modify it." Id. at 4.
 
 
 36
 Contemporaneous with the legislative efforts to amend the Reform Act to remove the flat ban on employee honoraria, Congress began considering its annual appropriations bill which, inter alia, set salaries for members of Congress. That bill, which was enacted into law as the Legislative Appropriations Act of 1991 ("Appropriations Act"), Pub.L. No. 102-90, 105 Stat. 447 (1991), provided for an increase in senators' pay, in "exchange" for which the Senate agreed to subject itself to the limitations on honoraria and outside income incorporated in the Ethics Act of 1989. See Pub.L. No. 102-90, Title I, Title III Sec. 6(b)(2), 105 Stat. 447 (1991). Accordingly, the appropriations bill that passed the Senate made a number of appropriate "technical" amendments to the Ethics Reform Act. See 137 CONG.REC. S10,267 (daily ed. July 17, 1991). None of those amendments would have affected the definition of "honorarium."[303 U.S.App.D.C. 277] Less than two weeks after passage of the Senate and House bills, the conference committee appointed to resolve differences between the bills submitted its report for approval by the House and Senate. See H.R.CONF.REP. NO. 176, 102d Cong., 1st Sess. (1991). The report included--and it is the first reference to the concept--an amendment modifying the definition of the term "honorarium" in the Ethics Reform Act. The following words were added to section 505(3): "(including a series of appearances, speeches, or articles, if the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government)" (emphasis added). See id. at 5. The appropriations bill, including this language, passed the House on a voice vote with little debate. See 137 CONG.REC. H6149, 6159 (daily ed. July 31, 1991). Although debate in the Senate was spirited, discussion focused largely on the question of the senators' pay raise. See 137 CONG.REC. S11,986-11,989 (daily ed. Aug. 2, 1991). Neither House addressed the rationale for amending the honorarium language. The only direct indication of the conference committee's purpose in adding this rider is the following sentence in the committee report: "Subsection (b) amends the definition of 'honorarium' to include payment for a 'series of appearances, speeches, or articles,' if the subject matter is related to the individual's duties or payment is made because of the individual's status with the Government, rather than only payment for a single event." See H.R.CONF.REP. NO. 176, at 12 (emphasis added). The report thus implies that by amending the Reform Act Congress sought to treat a "series" of lectures in the same manner as a single lecture for purposes of the honorarium ban. This amendment (the "Appropriations Rider") became effective on January 1, 1992, and the Office of Government Ethics implemented new regulations incorporating the new honorarium definition on January 8, 1992. See 57 Fed.Reg. 601 (1992).
 
 
 37
 The definition of "honorarium," as amended, now reads:
 
 
 38
 The term "honorarium" means a payment of money or anything of value for an appearance, speech or article (including a series of appearances, speeches, or articles if the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government) by a Member, officer or employee, excluding any actual and necessary travel expenses incurred by such individual....
 
 
 39
 5 U.S.C.App. 7 Sec. 505(3) (emphasis added).
 
 
 40
 Following passage of the Appropriations Act Rider, S. 242--which had once already passed the Senate unanimously and the purpose of which was to remove the flat ban on the receipt of honoraria by government employees--dropped off the legislative agenda.
 
 
 41
 These consolidated actions were first filed in the district court in December, 1990, even before the effective date of the Reform Act. The plaintiffs' affidavits, filed in the lower court actions, were all prepared prior to the act's amendment, at a time when the act provided for a flat ban on honoraria. The affidavits are therefore, to say the least, unhelpful in determining whether the affiants' conduct even falls within the amended ban.
 
 
 42
 Be that as it may, the lower court's judgment was issued in March, 1992--three months after the effective date of the 1991 Appropriations Rider. The district court opinion nevertheless quotes the prior and by-then repealed definition of "honorarium," and in so doing cites to the wrong version of the implementing regulations. See NTEU v. USA, Civ.Act. 788 F.Supp. 4, 6 (D.D.C.1992). The district court based its opinion that the act was unconstitutional on its face on the grounds that it contained a complete flat ban on the receipt of honoraria by federal employees. The court never construed the amended statute to determine whether it too included such a ban (perhaps because it was not brought to the court's attention), nor did it decide whether the plaintiffs' conduct was proscribed by the amended statute. And as I have noted, the panel did not focus on this issue either.
 
 B.
 
 43
 Federal courts are obliged to avoid constitutional issues if possible. Accordingly, "as [303 U.S.App.D.C. 278] between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 106, 72 L.Ed. 206. We followed that course only a few months ago, see Association of Am. Physicians & Surgeons, Inc. v. Clinton, 997 F.2d 898, 906, 910-911 (D.C.Cir.1993). To be sure, it does appear that both parties litigated the case on the assumption that the statute's amendment--limiting honoraria for a series of speeches only if the speeches implicate the duties or status of the government employee--was of no significance. It is certainly understandable, therefore, that the panel majority and the dissenting judge would not have focused on the possibility of a limiting construction of the statute. We need not, however, ignore the actual language of the statute in order to resolve the dispute the parties put before us. See United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, --- U.S. ----, ----, 113 S.Ct. 2173, 2177-78, 124 L.Ed.2d 402 (1993) (" '[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law,' even where the proper construction is that a law does not govern because it is not in force" (citation omitted)). Indeed, we had previously recognized our particular obligation to consider an argument not precisely raised if to do so avoids a constitutional issue. See Meredith Corp. v. FCC, 809 F.2d 863, 872 (D.C.Cir.1987).
 
 
 44
 In striking the statute down, the majority repeatedly refers to the statute's so-called flat ban as evidence of its overbreadth. Yet, whatever else the statute as amended means, it certainly no longer creates such a "flat ban"--at least when the speech implicated takes the form of a "series." This is hardly insignificant. Of the parties suing in their individual capacities, it may well be that none are engaged, or planning to engage, in conduct prohibited by the amended statute. As to these parties, at least, the judgment below--which applied a by-then repealed statute--should be reversed and the cause remanded for an application of the amended statute to their conduct.[3]
 
 
 45
 But what I find even more troubling is that the panel decision does not consider the distinct--indeed highly probable--possibility that the 1991 Appropriations Rider contained a simple unintended mispunctuation. Cf. National Bank of Oregon, --- U.S. at ----, 113 S.Ct. at 2182-84 (holding that a statute's punctuation may be disregarded where necessary to enforce congressional intent, and concluding that the quotation marks there at issue were misplaced).[4] It seems likely to me that Congress intended the parenthesis beginning with "or" to end before the clause beginning with "if," with the result that section 505, properly read, does not create a flat ban on the receipt of honoraria by governmental employees at all--whether or not their speech took the form of a single address or a series.[5]
 
 
 46
 [303 U.S.App.D.C. 279] There would appear to be only two possible constructions of the statute. The first would read the statute, as amended, as retaining the flat ban on the receipt of honoraria by employees for single speeches, while removing such a ban for the delivery of a "series" of such speeches, so long as those speeches concern subjects unrelated to the officers' employment. The difficulty with this reading, aside from the fact that it strains logic to understand why anyone would seek to draw a distinction between compensation for a one-time speech and a "series" of speeches, is that there is simply no indication that Congress intended to draw that distinction, or that it felt a need to amend the Reform Act along that line when it acted in August, 1991. On the contrary, the sole sentence addressed to this amendment in the Conference Committee Report strongly suggests that Congress intended to amend the act in a way that would treat one time acts and a "series" of acts under the same doctrinal framework. Given this background and in light of the constitutional difficulties entailed, I doubt very much that we should insist on reading the statute in the literal manner required by its current punctuation--especially when the result is to create an apparent anomaly in meaning. No party even suggests that Congress intended a distinction between single speeches and a "series" of speeches.
 
 
 47
 The second possible reading, one that views the close parenthesis mark as simply misplaced, would read the amended definition as subjecting both single speeches and a "series" of such speeches to the same doctrinal proviso: that is, that honoraria for both may be accepted, so long as the speeches in question do not relate directly to the official's duties or status. Unlike the first reading, this construction is both logical and, far more important, consistent with the legislative history that reveals a strong contemporaneous desire in Congress to amend the Ethics Reform Act so as to remove the flat ban on lower-level governmental employees. After all, we do know that there was a strong and unopposed contemporaneous congressional desire to amend the honoraria ban in order to remove the flat ban that had then applied to governmental employees.
 
 
 48
 Judge Williams, in his concurrence to this order, maintains that my suggested alternative reading of the language is not linguistically permissible. "[I]t bears no resemblance to English." See Opinion Concurring in the Denial of Rehearing En Banc, supra, at 1556. But, surely if Congress had actually put the close of the parenthetical where I would place it, no one would have difficulty understanding the meaning of the passage. Judge Williams also suggests that because it "surely" would have been a losing defense for an employee to argue that the unamended ban prohibited only single speeches and not a series of such speeches in amending the act explicitly to include a "series," Congress must have intended to draw a distinction between single speeches and a "series" of such speeches. See Opinion Concurring in the Denial of Rehearing En Banc, supra, at 1557. Apparently, that was not Congress' judgment. The report issued by the Senate committee that was studying proposed amendments to the Ethics Reform Act in April of 1991--only four months prior to the amendment in question--concluded otherwise.[6] Referring to the unamended version of the ban and in justification of its proposed amendments, the committee observed:
 
 
 49
 Ironically, the [unamended] honorarium ban prohibits fees only for certain speaking and writing, while leaving undisturbed the ability of federal employees to earn outside income from a wide variety of other "moonlighting" activities.... An employee can teach a full semester course on a particular subject, but cannot be paid for a single lecture on the same subject.
 
 
 50
 S.REP. NO. 102-29, at 5 (emphasis added). The legislative history thus suggests that Congress itself was concerned with the potentially disparate treatment to which the unamended act subjected single lectures and a "course" of lectures, and that it intended to remove that potential disparity. Congress' inclusion, then, of a "series" of lectures in its 1991 amendment, far from creating an inference that it sought to treat single speeches and a series of such speeches differently, was [303 U.S.App.D.C. 280] apparently motivated by quite the opposite desire. In short, the 1991 amendment sought to accomplish two objectives simultaneously: it clarified that the honorarium ban reached single speeches and a "series" of speeches alike and limited the ban on both pursuant to a "status or subject matter" test. Unfortunately, as so often occurs when legislation is fashioned hurriedly, the draftsmen simply appear to have made a mistake.
 
 
 51
 In response to my point that it simply makes no sense for Congress to have wished to treat one speech differently than a series, Judge Williams heroically suggests a number of possible justifications for such a distinction. I find his hypothetical congressional logic quite unconvincing--indeed farfetched--but, more important, there is not the slightest indication that Congress ever entertained Judge Williams' hypothetical reasoning. No one, as far as I know, prior to Judge Williams' concurrence (certainly not the parties), has ever even suggested that Congress thought that the added effort to give a series of paid speeches--presumably two rather than one--is a deterrent to corruption. Perhaps only those who have not heard many politicians or bureaucrats speak, and are more used to academic lectures, would assume that those speeches would require any effort or would need significant freshening. And the notion that a government official who speaks for pay more than once (twice?) to a group is less likely to be corrupted than one who speaks for compensation only once because the latter's behavior is more noticeable to the "public" than the former is, in my view, down right fanciful.
 
 
 52
 Finally, the added administrative burden on Congress and the courts that Judge Williams' interpretation of the statute implies is staggering. How would the courts and Congress--as to whom the honorarium ban as written continues to apply--determine when speeches or a split article constitute a "series"?
 
 
 53
 The panel's decision is actually anchored to the strength of Judge Williams' subsequently expressed hypothetical appraisal of a congressional purpose in distinguishing between a series of speeches and single appearances. I think his explanation is unpersuasive. But it certainly cannot be thought so powerful as to preclude the acceptability of my alternative construction. See Blodgett v. Holden, supra. Both a logical reading of the statute, as well as an examination of the legislative history, suggest that section 505(3) can be construed as not banning the receipt of honoraria by governmental employees for speeches and writings unrelated to those employees' official duties or status. As so construed, the act clearly survives constitutional scrutiny. Judge Williams agrees that a statute that would ban governmental employees from profiting by speaking and writing on subjects directly related to their official duties, or where payment is related to the status of such officials, would be constitutional. See slip op. at 7. Under these circumstances, I should think that we would at least ask the parties to brief this issue before holding the Act unconstitutional.[7]
 
 C.
 
 54
 Assuming, arguendo, that the statute should be read as literally punctuated, I [303 U.S.App.D.C. 281] would agree with my colleagues that the statute is unconstitutional. I am tentatively of this view because, unlike the panel, I see the statute, not as overly broad, but as not broad enough; that is, by failing flatly to ban honoraria given in exchange for a series of speeches and addresses, Congress has undermined any asserted interest in a prophylactic flat ban on paid speeches. The court should rehear the case, whether or not it is thought that the constitutional issue might be avoided, because the panel's constitutional analysis misapplies Supreme Court precedent.
 
 
 55
 The framework for evaluating the constitutionality of regulations on governmental employee speech was set out for the first time by the Supreme Court in Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Recognizing that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," 391 U.S. at 568, 88 S.Ct. at 1734 (emphasis added), the Court articulated a fairly relaxed standard of review to govern such cases. Under the Pickering test, a court, in reviewing a restriction on governmental employee speech, must "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734. Significantly, the governmental interest involved need not be compelling, or even substantial. Nor, as the Court has subsequently made clear, must the government demonstrate that its interest substantially outweighs the burden on speech created by the regulation in question. See Connick v. Myers, 461 U.S. 138, 150, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983) (specifically rejecting the lower court's conclusion that the government had a "burden to 'clearly demonstrate' that the speech involved 'substantially interfered' with official responsibilities"). Under Pickering and its progeny, all that is required is that the governmental interest involved outweigh--by some amount--the burden on speech imposed by its regulation.
 
 
 56
 In light of these precedents, had Congress actually enacted a flat ban on the receipt of honoraria by government employees, my tentative view, like Judge Sentelle in dissent, 990 F.2d at 1292-1295 (Sentelle, J., dissenting), is that such a ban would be constitutional. The panel terms the governmental interest in preventing corruption and the appearance of impropriety by government servants "strong," 990 F.2d at 1274, but we have elsewhere suggested that "prevent[ing] the erosion of ... public confidence in the integrity of [government employees]" amounts to a "compelling" governmental interest. Keeffe v. Library of Congress, 777 F.2d 1573, 1581 (D.C.Cir.1985). That is not all. Under the subject or status test, which the statute applies to a "series" of speeches--and the panel would apply as a matter of constitutional law to all speeches--it could be devilishly difficult to fashion implementing regulations and even more difficult to apply them in thousands of cases.[8] This administrative burden, in conjunction with the underlying goal sought to be attained, would seem to me sufficient to justify the imposition of a prophylactic ban on the receipt of honoraria by governmental employees. As the Supreme Court unanimously cautioned in the course of reversing this court before, we should "[not] second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." FEC v. National Right to Work Comm., 459 U.S. 197, 210, 103 S.Ct. 552, 561, 74 L.Ed.2d 364 (1982).
 
 
 57
 Yet, having accepted precisely this burden for the entire government with regard to the delivery of a "series" of speeches, it seems to me that Congress itself has vitiated any asserted interest in a prophylactic ban on the receipt of honoraria for one-time speeches. This is not to suggest, however, that the statute in question fails constitutional scrutiny on the grounds that it is "underinclusive." [303 U.S.App.D.C. 282] Congress can seek to address the problem of corruption in a piece-meal fashion if it so chooses. It is to recognize, however, that the extent to which Congress has chosen to ban an activity will be relevant in assessing Congress' real interest in so doing.
 
 
 58
 Similarly, I regard overbreadth as a problem in the Pickering context only insofar as it affects the Pickering balance of the burden on speech created by the government action in question with the government interest sought to be furthered. Although a prior decision in this circuit held that a restriction on speech of government employees must be "narrowly drawn" to "restrict speech no more than is necessary" to further the relevant governmental interest, see McGehee v. Casey, 718 F.2d 1137, 1143 (D.C.Cir.1983), the Supreme Court itself has never held the absence of so-called "narrow tailoring" to constitute an independent ground for invalidating a regulation of government employee speech. The breadth, as well as the weight, of the governmental restriction is of course relevant to the Pickering analysis. When the government burdens substantially more speech than "required" by its asserted interest, then its asserted interest might not outweigh that greater burden. After all, the greater the burden on speech, ceteris paribus, the more the Pickering balance will point toward invalidation of the rule. The flaw in the McGehee narrow tailoring analysis is that the concept of narrow tailoring grows out of the constitutional skepticism with which the Court regards government regulation of private speech. The government must do no more than what the Court or courts regard as "necessary". That is simply not the appropriate attitude with which we review government attempts to control the speech of employees.
 
 
 59
 Although the panel opinion seems to rely heavily on the concept of narrow tailoring, Judge Williams, in his concurrence, describes it as only a "metaphor" for a balancing test not significantly different than Pickering's. Some metaphor! As I understand the panel opinion, the entire ban on honoraria is unconstitutional so long as the court believes even one employee who should be permitted to speak for pay is not permitted. Consistent with this approach, the panel did not even carefully inquire into the situation of the very plaintiffs before it.[9] Although Judge Williams disavows McGehee v. Casey, supra, as implicitly disapproved by the Supreme Court in Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the panel seems to have followed it--in spades. The real difficulty with the panel's analysis, in my view, is that it totally disregards any potential administrative burdens on the government--Judge Williams describes these as "line-drawing problems," as if they were insignificant. See Opinion Concurring in the Denial of Rehearing En Banc, supra, at 1558. Yet, these administrative burdens are part of the government's legitimate interest which must be weighed in determining whether a prophylactic ban that may sweep broader than the court would wish is constitutionally permissible.
 
 
 60
 Thus, a proper analysis of the government's interest as an employer in the efficient running of the workplace--a need recognized in Pickering and its progeny as the basis for the relaxed review proper to such circumstances--must include its interest in minimizing enforcement and administrative costs. Even where a governmental regulation of employee speech extends to more situations than arguably "necessary" to further the government's primary interest, that regulation might still survive Pickering inquiry, especially when the burden of crafting--and then enforcing--a more limited ban is added to the "government interest" side of the Pickering balance. Precisely because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," Pickering, 391 U.S. at 568, 88 S.Ct. at 1734 (emphasis added), the government is not required to shoulder the same degree of enforcement costs when regulating its workplace that it must when private speech is involved.
 
 D.
 
 61
 Finally, as Judge Sentelle pointed out in dissent, the panel's choice of remedy is extremely [303 U.S.App.D.C. 283] troubling. All that is needed to cure the constitutional infirmity is to relieve the ban on compensation from single speeches whose subject does not relate to the employee's job and when the status of the employee is not implicated. That takes only a minor modification of the definition of honorarium--indeed, one I believe Congress affirmatively intended. See 990 F.2d at 1283-85, supra. Instead, the panel strikes down the entire statute, as it applies to the executive branch, including even, inexplicably, the obviously constitutional ban on executive branch employees giving a series of speeches directly drawn from their own work or where their status is obviously implicated.[10]
 
 
 62
 Judge Williams' concurrence leaves me even more perplexed than before. He agrees that my construction of the statute (or my remedial approach), which applies a "status or subject matter" limitation to the honorarium ban, "transform[s] the statute into one of virtually undoubted constitutionality." See Opinion Concurring in the Denial of Rehearing En Banc, supra, at 1556. The amended act's ban on a series of appearances, which Judge Williams agrees includes precisely such a limitation, must, then, be constitutional. It seems to me, then, that the panel, by striking down even that ban, employed as its governing metaphor--rather than "narrow tailoring"--tossing out the constitutional baby with the arguably unconstitutional bath water.
 
 
 63
 The panel justifies its refashioning of the legislation to treat executive branch employees more favorably than employees of the other two branches by asserting that Congress would have wished to totally ban honoraria for legislative and judicial officers and employees because the subject matter before those two branches is so broad. But Congress explicitly concluded otherwise--at least with respect to a series of speeches. No distinction was drawn between the three branches, and although it may well be that a congressman's status is typically implicated when he or she gives a speech for money, it might not be true of judges. And there is certainly no reason to distinguish a mail room employee in the Treasury Department from a mail room employee in a federal court. The panel's remedy permits the former to lecture for money on, let us say, the Quaker religion, but assumes Congress would have wished to prohibit the latter from doing so--and, paradoxically, implies that it would be constitutional for Congress to ban all such speeches for judicial branch employees. See pp. 1565-66.
 
 
 64
 When a court severs the constitutional portion of a statute--particularly in a statute lacking a severance clause--it should be careful to condemn only the parts it holds unconstitutional, and it should seek to adhere, as much as possible, to congressional intent. See Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987); Champlin Ref. Co. v. Corporation Comm'n of Oklahoma, 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932). Neither the panel opinion nor Judge Williams' concurrence explains why simply holding that a ban on single speeches and articles more extensive than that which applies to a series of speeches or articles is unconstitutional would not have been a less intrusive, "narrowly tailored," manner of excising any constitutional infirmity. Here, Judge Williams' hypothetical rendition of congressional reasons for distinguishing between single speeches and a series, even if it were persuasive, just will not do. On the contrary, Judge Williams' view that Congress intended to draw a distinction between a "series" of speeches and a "single" speech, and that such a distinction is logical, makes the panel's result--which subjects both bans to the same remedy--particularly anomalous. As I noted above, when a court severs a portion of a statute it should seek to adhere to congressional intent. Judge Williams' view that Congress had good reason to treat a series differently from a "single" speech, along with the fact that Congress' ban as to a series is beyond doubt constitutional, should have led the panel (or the en banc court) to sustain at least that portion of the ban. In [303 U.S.App.D.C. 284] any event, the parties should be heard on this crucial question.
 
 
 65
 * * * * * *
 
 
 66
 It may well be that neither the plaintiffs nor the government for their own respective tactical or political reasons had any incentive to focus this court's attention on the parenthetical clause that I believe should have guided the panel's opinion--or at least its remedy. But given the grave constitutional issues at stake, I think we should oblige the parties to explore the vast middle ground between their artificially extreme positions. My colleague objects to rushing into an en banc for this purpose, but I would have thought hastening to declare an act of Congress unconstitutional was the greater judicial imprudence. I would actually prefer that the panel initially explore the issues aired in my and Judge Williams' opinions, but I would rather have an en banc rehearing to none at all.
 
 
 
 [1]
 The draftsmen could have attained the aim inferred by Judge Silberman with no such confusion. For example:
 The term "honorarium" means a payment of money or anything of value for an appearance, speech or article by a Member, officer or employee, if the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government, except that the term excludes any actual and necessary travel expenses incurred by such individual....
 
 
 [2]
 To reflect the 1991 amendment, the OGE's implementing regulations now specify that the ten speeches are unequivocally barred if they are "unrelated". See 5 CFR Sec. 2636.203(a) (Example 3). The OGE, unlike Judge Silberman, reads the amended statute to mean what it says; the OGE regulations stipulate that the honorarium ban does not cover "[p]ayment for a series of three or more different but related appearances, speeches or articles, provided that the subject matter is not directly related to the employee's official duties and that the payment is not made because of the employee's status with the Government." 5 CFR Sec. 2636.203(a)(13)
 
 
 [3]
 Judge Silberman's "understand[ing]" the panel opinion to invalidate an honorarium ban "so long as the court believes even one employee who should be permitted to speak for pay is not permitted [to do so]", see Silberman, J., at 1566, is of course a misunderstanding. Such a position would ignore the Ward Court's use of the word "substantially". The panel invalidated the ban only after finding that it "reach[ed] a lot of compensation that has no nexus to government work that could give rise to the slightest concern", Op. at 1564, and after reviewing the line-drawing concerns that might have justified the broader ban, id. at 1564-66
 
 
 [1]
 The Senate voted against a ban on honoraria, but, unlike the House, did not accept the pay raise passed as part of the ethics package
 
 
 [2]
 A virtually identical bill, H.R. 3341, was originally introduced in the House as H.R. 325 on January 3, 1991. See H.R.REP. NO. 385, 102d Cong., 1st Sess. 7 (1991)
 
 
 [3]
 Because the plaintiffs' affidavits were filed before the 1991 amendment was passed, those affidavits are often ambiguous as to whether or not the affiants in question were engaged in a "series" of lectures. Nevertheless, it seems relatively clear that at least some of the actions filed below no longer state a claim. To take but one example, the National Treasury Employees Union, suing on its own behalf, claims that it is injured by the fact that under the flat ban imposed by the old act it could not continue to pay a government employee to write its monthly newsletter. See Affidavit of Charles Giunta, J.A. at 79. Under the amended statute and the O.G.E. regulations, however, such an arrangement would clearly be permissible as constituting a series of articles. See 5 C.F.R. Sec. 2636.203(a)(13), example 6
 
 
 [4]
 That possibility is all the more likely given the limited time between the amendment's incorporation as a rider to the appropriations bill and that bill's passage, as well as the fact that Congress' focus was clearly on other matters: namely, the question of the senators' pay raise in the midst of a recession
 
 
 [5]
 In other words, the statute should read:
 The term "honorarium" means a payment of money or anything of value for an appearance, speech or article (including a series of appearances, speeches, or articles) if the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government by a Member, officer or employee, excluding any actual and necessary travel expenses incurred by such individual....
 
 
 [6]
 This report was appended to NTEU's appellate brief
 
 
 [7]
 Given that the statute as amended might be viewed as ambiguous, it might also be thought that Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), commands deference to the agency entrusted with the act's administration (Office of Government Ethics), and that OGE's regulations, which enforce the literal reading of the statute, control the day. (The panel opinion itself does not rely on the Office of Government Ethics' interpretation of the act.) It is settled, however, that Chevron deference is not due to a regulation which interprets an act of Congress in a manner that raises serious constitutional difficulties. See Edward J. De Bartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 500-01, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 (1979). That principle survives Rust v. Sullivan. See --- U.S. ----, ----, 111 S.Ct. 1759, 1771, 114 L.Ed.2d 233 (1991) (affirming that principle but finding that the regulations there at issue did not raise sufficiently serious constitutional difficulty). In this case there can be no doubt that the regulations, implementing the literalistic reading of the statute, raise serious constitutional difficulties. Under these circumstances, I would not defer to the agency's views, and would instead construe the statute to enforce its logical meaning
 
 
 [8]
 For example, as an ex-ambassador to Yugoslavia, I have been asked to speak on events in that former country. If I did so for an honorarium, would it have anything to do with my present status as a judge? Would it depend on whether lawyers were part of the group that invited me, or whether they were in the audience?
 
 
 [9]
 See supra n. 3
 
 
 [10]
 The panel takes solace from executive branch regulations that might prohibit such--but Congress did not, and it is our task to apply legislation as much as possible